

FILED
2013 Jan-25 AM 10:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SHEBA RHODES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-11-S-1215-NE** |
| | ) | |
| **THE ARC OF MADISON** | ) | |
| **COUNTY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Sheba Rhodes, asserts claims against defendant, The Arc of Madison County, Inc., for wrongful termination in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and for negligent hiring, training, supervision, and retention in violation of state law. This action is before the court on three motions filed by defendant: *i.e.*, a motion for summary judgment; a motion to strike portions of plaintiff's response in opposition to defendant's motion for summary judgment; and a motion to strike portions of the affidavit of Constance Jones.[1] Upon consideration of the parties' briefs and evidentiary submissions, the motion to strike portions of plaintiff's response will be granted in part and denied in part, the motion

---

[1] *See* doc. no. 20 (Motion for Summary Judgment); doc. no. 26 (Motion to Strike Portions of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment); doc. no. 29 (Motion to Strike Portions of the Affidavit of Constance Jones).

to strike portions of Jones's affidavit will be granted, and the motion for summary judgment will be granted in part and denied in part.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration supplied).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> [However,] [t]he mere existence of *some* factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal

citations omitted) (alterations and emphasis suppled).

## II.  SUMMARY OF FACTS

**A.    Plaintiff's Employment as an Instructor at The Arc**

Plaintiff, Sheba Rhodes, was employed by defendant, The Arc of Madison County, Inc. ("The Arc"), as an instructor in a day program for adults with intellectual disabilities and developmental delays from July 12, 2006 to August 12, 2010.[2]  Prior to her employment at The Arc, plaintiff worked at "Volunteers of America" and "Ability Plus," two organizations that served the needs of the mentally disabled.[3]

During her two-year term at Volunteers of America, plaintiff was supervised by Program Director Kertrina Sharperson, who eventually left that organization and became Program Coordinator for defendant.[4]  While Sharperson testified that she voluntarily resigned from Volunteers of America because she was getting a divorce and having medical issues,[5] plaintiff alleged that Sharperson was forced to resign because she engaged in theft and Social Security fraud.[6]  Before hiring Sharperson,

---

[2] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 1 (Employment Application) and exhibit 3 (Termination Notice); doc. no. 23-3 (Affidavit of Susan Klingel) ¶¶ 2-3.

[3] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 11-14.

[4] *Id.* at 16-19.  Sharperson's first name is spelled variously throughout the record, including as "Katrina."  *See, e.g.,* doc. no. 1 (Complaint) ¶ 11.

[5] Doc. no. 23-1 (Deposition of Kertrina Sharperson), at 9.

[6] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 2 (Interrogatory Responses) ¶ 4.

3

defendant conducted a background check, and found no cause for concern.[7]

Regardless of Sharperson's reasons for leaving Volunteers of America, when she assumed the position of Program Coordinator for defendant, she encouraged plaintiff to apply for employment.[8]  Plaintiff submitted an application on June 16, 2006, was interviewed by Qualified Mental Retardation Professional ("QMRP") David Lane, and hired as an aide on July 12 of the same year.[9]  Upon the recommendation of Sharperson, and with the approval of defendant's Executive Director, Susan Klingel, plaintiff was then promoted to instructor, and trained by QMRPs Lane and Ann Finley.[10]

While working as an instructor in defendant's day program, plaintiff's regular duties included feeding and changing the soiled undergarments of clients with intellectual disabilities and developmental delays, as well as "teaching them everyday functions of life."[11]  Despite the fact that the State of Alabama generally requires a ratio of one instructor to four clients, plaintiff had eight or nine students and one or two aides at any time.[12]  In any event, plaintiff was ultimately responsible for the

---

[7] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 17.

[8] Doc. no. 23-1 (Deposition of Kertrina Sharperson), at 24.

[9] *Id.*; doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 1 (Employment Application).

[10] Doc. no. 23-1 (Deposition of Kertrina Sharperson), at 25, 27-28, 49.

[11] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 48-49.

[12] *Id.* at 49.

4

conditions in her classroom.[13]

During her time as an instructor, plaintiff was supervised by QMRPs Lane and Finley and Program Coordinator Sharperson: Lane and Finley reported to Sharperson, who, in turn, reported to Exective Director Klingel.[14]  As a staff member in the day program, plaintiff also interacted with Medicaid Program Coordinator Roslyn Bridges, who ran the program and investigated allegations of client abuse, neglect, and mistreatment when assigned to do so by Klingel.[15]

Plaintiff and Program Coordinator Sharperson had a falling out in 2006 or 2007.[16]  After defendant hired plaintiff's former supervisor, Yolanda Watkins (who is no longer employed at The Arc), plaintiff alleges that Watkins developed an intimate relationship with her and also Sharperson.[17]  Watkins allegedly "convinced [Sharperson] somehow that [plaintiff] was a bad employee, [that she] wasn't doing what [she] was supposed to do[,] [and that she] was running behind [Sharperson]."[18]

---

[13] Doc. no. 23-2 (Deposition of Roslyn Bridges), at 7, 61.

[14] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 25-27; doc. no. 22-3 (Deposition of Susan Klingel), at 6; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 8, 16-17.

[15] Doc. no. 23-2 (Deposition of Roslyn Bridges), at 7-8, 10; doc. no. 22-3 (Deposition of Susan Klingel), at 11-12.

[16] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 168.

[17] *Id.* at 166-67.

[18] *Id.* at 167 (alterations supplied).

Eventually, plaintiff ended her intimate relationship with Yolanda Watkins because she knew that Watkins also was intimately involved with Program Coordinator Sharperson, and because she was hesitant to jeopardize her employment with defendant.[19]   Thereupon, plaintiff alleges that *Watkins* launched a campaign of sexual harassment against plaintiff, but that Sharperson believed that *plaintiff* was sexually harassing Watkins.[20]   Sharperson then called plaintiff into her office, where she and plaintiff exchanged words, and Sharperson threatened to fire plaintiff if she did not "leave [Watkins] alone."[21]

As a result of their conflict over Watkins, plaintiff alleges that Program Coordinator Sharperson "harassed [her] and tried to get [her] fired."[22]   However, plaintiff did not report the harassment to either Executive Director Klingel or Medicaid Program Coordinator Bridges.[23]   By way of explanation, plaintiff alleged that complaining to Klingel or Bridges was "like talking to that wall over there,"[24] because "[n]othing gets done."[25]   However, plaintiff admitted that she did not have

---

[19] *Id.* at 168.

[20] *Id.*

[21] *Id.* (alteration supplied).

[22] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 183 (alterations supplied).

[23] *Id.* at 179.

[24] *Id.* at 171.

[25] *Id.* at 175 (alteration supplied).

any personal experience with the effectiveness of defendant's reporting processes.[26]

Program Coordinator Sharperson denied that she harassed plaintiff, that she believed that plaintiff should be terminated, or that she urged Executive Director Klingel to do so.[27]  For her part, Klingel denied that she was aware of problems between Sharperson and plaintiff.[28]

## B.    Plaintiff's Request for FMLA Leave and Eventual Termination

In 2008, and again in 2009, well before the events giving rise to this action, plaintiff took leaves of absence from her employment with defendant under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), "and no one gave [her a] hard time about [it]."[29]

Plaintiff told Program Coordinator Kertina Sharperson that she was planning to request FMLA leave once again in June of 2010, this time for gallbladder and hernia repair surgery.[30]  Plaintiff submitted her third request for FMLA leave on June 30, 2010, received her FMLA request packet on July 1, 2010, and obtained a certification of having a serious health condition from her physician on July 6 of the

---

[26] *Id.* at 179-80.

[27] Doc. no. 23-4 (Affidavit of Kertrina Sharperson) ¶ 3.

[28] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 17.

[29] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 163, 188 (alterations supplied).

[30] *Id.* at 41.

same year.[31]  Plaintiff then faxed the paperwork and received defendant's approval on

July 12, 2010 to begin her leave on August 16 of the same year.[32]

During her deposition, plaintiff testified that, around the time she was gathering

her paperwork to request FMLA leave, Program Coordinator Sharperson told plaintiff

and plaintiff's supervisor, QMRP Ann Finley, that she did not want plaintiff to have

the surgeries because "it was too many people trying to take FMLA [leave].  And

[plaintiff had] already taken FMLA [leave] twice and [she] was taking it again.

[Sharperson] was tired of folks asking for FMLA [leave]."[33]   Sharperson denied

making those statements.[34]

On August 5, 2010, less than two weeks before her scheduled FMLA leave,

plaintiff was suspended, pending an investigation of a coworker's allegations that she

had abused a client.[35]  One week later, defendant gave plaintiff a termination notice

stating that:

> Following an investigation, it has been determined that you failed
> to implement the approved behavior program for an individual.  Your
> failure to comply with established behavior strategy steps was neglectful
> and had a detrimental effect on the individual.  Your employment is

---

[31] *Id.*, exhibit 4 (2010 Request for FMLA Leave).

[32] *Id.*

[33] *Id.* at 31, 164.

[34] Doc. no. 23-4 (Affidavit of Kertrina Sharperson) ¶¶ 3-4; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 85.

[35] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 47-48, 210.

terminated as of today.[36]

## C.     The Job Duties of an Instructor in the Day Program

In order to understand the alleged reasons for plaintiff's termination, one must understand the job duties of an instructor in the day program.

### 1.     The day program

Defendant is a non-profit corporation that serves individuals of all ages who have intellectual disabilities and developmental delays.[37]  In addition to offering a residential group home, critical life skills training, and job support and supervision for individuals within the community, defendant provides a day program for adults that places clients in a classroom with a trained instructor for five hours a day, five days a week, to receive educational, vocational, and adaptive daily living skills, training, and support.[38]

In contrast to the mere custodial care that is offered at nursing homes and other institutions, the day program provides "active treatment," which involves continuously assessing the client, providing, monitoring, and modifying the client's training based on progress.[39]  To facilitate "active treatment," each client has a set of

---

[36] *Id.*, exhibit 3 (Termination Notice).

[37] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 2.

[38] *Id.* at ¶¶ 2-3; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 61-62.

[39] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 3.

9

Active Treatment Protocols ("ATPs") which are designed specifically for the client, and which constitute the curriculum to be taught at the day program.[40]

Many of the clients in the day program have severe or profound mental retardation, and some clients are prone to various negative behavior, including aggression.[41] Thus, the staff is trained on how to deal with negative behavior, on how to redirect the client to positive behavior, and on how to refocus the client on the ATPs.[42]

### 2.     The Behavior Support Plans ("BSPs")

The State of Alabama requires that clients taking at least two forms of psychotropic medication also have Behavior Support Plans ("BSPs") which are developed by a team of mental health professionals to decrease the clients' negative behavior and increase their positive behavior using redirection and positive reinforcement.[43] Among other things, a BSP contains a list of "reinforcer" activities: *i.e.*, a unique list of activities deemed to encourage a particular client to engage in positive behavior.[44]

---

[40] *Id.*; *see also* doc. no. 22-1 (Deposition of Sheba Rhodes), at 49.

[41] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 4.

[42] *Id.*

[43] *Id.*; doc. no. 22-3 (Deposition of Susan Klingel), at 31-32; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 42.

[44] *See, e.g.,* doc. no. 22-1 (Deposition of Sheba Rhodes), at 223-24.

Because the purpose of a BSP "is to help change negative behavior into positive behavior," it does not encompass all interactions between an instructor and her client, but only addresses those interactions that are related to behavior.[45]  Further, a BSP does not specify the amount of time that an instructor must spend on each of the listed "reinforcer" activities.[46]  Finally, a BSP is only one of the tools used by employees who interact with mentally retarded individuals.[47]

If the State of Alabama Department of Mental Health determines that defendant failed to enforce a BSP, defendant could lose certifications and funding.[48]  Thus, instructors are required to implement the day program curriculum while adhering to the BSPs of the clients in their classrooms, and using those BSPs to combat negative behavior.[49]

Instructors are provided with BSPs for any clients with whom they interact in their classrooms.[50]  Instructors are then required to read and certify that they understand and will implement the BSPs.[51]  The mandatory review process affords

---

[45] Doc. no. 22-3 (Deposition of Susan Klingel), at 96-97.

[46] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 223-24.

[47] *Id.* at 203-04.

[48] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 6; doc. no. 23-2 (Deposition of Roslyn Bridges), at 98-99.

[49] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 5.

[50] *Id.*; *see also* doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 5 (BSP), at ARC000093.

[51] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 5; *see also* doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 5 (BSP), at ARC000093.

11

instructors the opportunity and obligation to raise any questions about the BSPs' contents.[52]

### 3.    The "Individual Abuse, Neglect, and Mistreatment" policy

Defendant's written policy on "Individual Abuse, Neglect, and Mistreatment" defines the term "neglect" as:

> the failure to carry out a duty through reckless conduct, carelessness, inattention, or disregard of duty whereby the individual is exposed to harm or risk of harm, and includes but is not limited to:  failing to appropriately supervise individuals or otherwise leaving individuals unattended, including sleeping, failing to ensure that individual's [sic] basic needs for safety, nutrition, medical care and personal attention are met, *failing to provide treatment in accordance with the treatment plan* or failing to develop a treatment plan, and utilizing treatment techniques, e.g., restraints, seclusion, etc., in violation of Arc policy and procedures, whether or not injury results.  Incidents resulting in injury where both the perpetrator and the victim receive services by the Arc are investigated to determine if the occurrence of such incident may have been the result of neglect.[53]

Defendant's "Individual Abuse, Neglect, and Mistreatment" policy requires staff members to follow a BSP until it is changed by the individuals charged with its administration, regardless of whether any staff member, including Executive Director Susan Klingel, believes that the BSP should be amended.[54]   Instructors receive

---

[52] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 5.

[53] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 8 (Individual Abuse, Neglect, and Mistreatment), at 209-10 (emphasis supplied).

[54] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 6; doc. no. 23-2 (Deposition of Roslyn Bridges), at 107.

mandatory annual training on the "Individual Abuse, Neglect, and Mistreatment" policy.[55]  Klingel has terminated numerous employees for violating the policy.[56]

## D.    Plaintiff's Job Performance

### 1.    "Christina's" Behavior Support Plan

The given name of one of plaintiff's students was "Christina."[57]  Like many of defendant's clients, Christina sometimes engaged in aggressive or self-injurious behavior, including biting, slapping, hitting, and kicking.[58]  Accordingly, Christina had a Behavior Support Plan ("BSP") which was implemented on December 31, 2009, before Christina's transfer to plaintiff's classroom, and within eight months of plaintiff's ultimate termination.[59]

Christina's BSP indicated that her aggressive and self-injurious behavior was motivated by a desire for escape, attention, and sensory stimulation.[60]  Thus, the BSP stated that, "[t]o address the escape function of Christina [sic] target behaviors and to address the communication problems he [sic] has with making her needs known,

---

[55] Doc. no. 23-1 (Deposition of Kertrina Sharperson), at 86.

[56] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 7.

[57] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 52.  "Christina's" last name has been redacted to protect her privacy.

[58] *Id.* at 83-84, and exhibit 5 (BSP), at ARC000090-ARC000091; doc. no. 22-3 (Deposition of Susan Klingel), at 48.

[59] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 72, 74.

[60] *Id.*, exhibit 5 (BSP), at ARC000091.

Christina will be taught to indicate to staff her basic needs."[61]  The BSP also contained

instructions for preventing aggressive and self-injurious behavior, which stated:

> If Christina is engaging in **Physical Aggression** that is highly
> disruptive and she must be removed from the area, do so with NO
> TALKING.  Do not tell her to calm down at this time/Do not ask her at
> this time if she needs anything/Simply escort her out.  Any talking with
> her about her behavior at this point will serve to reinforce it (attention
> function).  If physical aggression continues outside of original area, the
> staff may place Christina in a crisis prevention intervention, approved by
> Anita's Home physical intervention, until she appears to be calm, for no
> longer than five minutes.  This may be repeated two times before
> contacting the QMRP for further instructions.

> If Christina engages in **Self Injurious Behavior**, she must be
> removed from the area without talking to him [sic].  Staff can try to
> watch an Alvin and the Chipmunks movie and video because this can
> calm her down.  Staff needs to hold Christina's arms gently to prevent
> her from further hitting herself or causing injuries.  Staff will attempt to
> figure out what it is that is causing the behavior (*i.e.*, identify item that
> is causing irritation, identify if Christina is in pain, identify if Christina
> is hungry or thirsty, identify what task that Christina does not want to do,
> and give her a break from it).  If something is irritating Christina in her
> environment, remove the item.  If Christina is hungry or thirsty, give her
> something to eat or drink.  If Christina seems to be in pain, report to the
> nurse and house manager.  If Christina needs a break from a task then
> give her a break and try again after she has calmed down.  If an injury
> has occurred, staff needs to complete an accident and injury report on the
> injury.[62]

Christina's BSP also contained instructions for reinforcing appropriate

behavior.  It listed the following "reinforcer" activities, *i.e.*, various activities designed

---

[61] *Id.*, exhibit 5 (BSP), at ARC000092 (alteration supplied).

[62] *Id.*, exhibit 5 (BSP), at ARC000092 (emphasis in original).

14

to encourage positive behavior: "Alvin and the Chipmunks, Listening [sic] to music, coloring, dancing, verbal praise, playing with her baby doll, 1:1 attention."[63]  The BSP further included a section entitled "Reinforcement for Appropriate Behavior," which stated:

> If Christina ceases target behavior at any time, then staff should provide him [sic] with praise/recognition for appropriate behavior. When she calms down, give her praise and encourage her to return to previous activity.  If he [sic] returns to previous activity, praise her for returning.  If she begins engaging in the required activity, then give a lot of praise/recognition.[64]

Finally, Christina's BSP stated that it was "to be implemented at all times and in all locations unless specified otherwise," but "only . . . by staff that has been trained on the specific procedures of this program."[65]  Accordingly, plaintiff signed the BSP to certify that

> I have been [sic] in-service on Christina [sic] In-service for the individual listed below.  I have had the opportunity to ask questions regarding the in-service and to have them answered.  I understand that I am responsible for seeking direction from the QMRP if I do not understand any or all of this in-service and any or all of the responsibilities I have regarding instructing the client and providing care for the client.  I agree to abide by the team's recommendations and assist the individuals in carrying out these goals and objectives.  I also agree to report and document as required by the Habilation team, my

---

[63] *Id.*, exhibit 5 (BSP), at ARC000090.

[64] *Id.*, exhibit 5 (BSP), at ARC000090-ARC000091.

[65] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 5 (BSP), at ARC000092.

supervisor and/or the R-QMRP.[66]

Although plaintiff received in-service training on handling aggressive clients, and annual training on defendant's "Individual Abuse, Neglect, and Mistreatment" policy,[67] plaintiff testified that she was not trained on each BSP.[68]   Further, even though plaintiff understood that defendant expected its staff to read and understand BSPs "throughly," she testified that she did not read Christina's BSP "thoroughly."[69] Plaintiff nevertheless perceived that she was supposed to maximize the use of one-on-one interaction and other "reinforcers" for positive behavior,[70] that she was not supposed to permit Christina to fall asleep while class was in session,[71] and that deviation from a BSP constituted neglect, and was grounds for termination.[72]

## 2. Plaintiff's alleged deviations from Christina's Behavior Support Plan

By August of 2010, plaintiff testified that she had worked with Christina for eight to ten months.[73]   As noted in Section II(A), *supra*, plaintiff generally had eight

---

[66] *Id.*, exhibit 5 (BSP), at ARC000093.

[67] *Id.* at 50, 77, 114, 117, 214.

[68] *Id.* at 50, 212.

[69] *Id.* at 80, 77, 114, 117, 214, 212.

[70] *Id.* at 88, 227.

[71] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 81, 117.

[72] *Id.* at 77, 114, 117, 214.

[73] *Id.* at 72-73.   The exact amount of time that plaintiff worked with Christina is not clear. The record reflects that Christina's BSP was implemented on December 31, 2009, and that plaintiff's employment was terminated on August 12, 2010.  *Id.* at 72, 74, and exhibit 3 (Termination Notice);

or nine students and the assistance of one or two aides.[74]  Thus, unless a staff member was assigned to a specific client, there was not enough staff to provide every client with one-on-one supervision.[75]  At least two of plaintiff's students had Behavior Support Plans ("BSPs"), one of whom was Christina.[76]  Of the two students with BSPs, one-on-one care was required for one of the students, but such care was not required for Christina.[77]

Plaintiff found Christina's behavior difficult to control.  She testified that, "when [Christina] was up, when she was not sleeping, she was a terror.  She would get up hitting the other clients [and] fighting the staff."[78]  Plaintiff also testified that, "[i]f [Christina] wasn't laying her head down, getting in one of her little moods, she's fighting staff and fighting clients 24/7."[79]  According to plaintiff, she "was the only one, basically, that could control [Christina]."[80]

On one hand, plaintiff is neither an expert on BSPs, nor responsible for

---

doc. no. 23-3 (Affidavit of Susan Klingel) ¶¶ 2-3.  However, plaintiff testified that Christina's BSP was implemented *before* her transfer to plaintiff's classroom.  Doc. no. 22-1 (Deposition of Sheba Rhodes), at 74.  If that is the case, then plaintiff could only have worked with Christina for, at most, seven and a half months.

[74] *Id.* at 49.

[75] *Id.* at 218-19, 225-26.

[76] Doc. no. 23-1 (Deposition of Kertrina Sharperson), at 43-44.

[77] *Id.* at 38-39.

[78] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 51 (alterations supplied).

[79] *Id.* at 61 (alterations supplied).

[80] *Id.* at 51 (alteration supplied).

designing them.[81]  On the other hand, plaintiff testified that "[t]he ones that put the [BSPs] together is just doctors and psychiatrists.  They don't work with [clients] one on one like [instructors] do."[82]  Indeed, some of the Qualified Mental Retardation Professionals who design BSPs ask for input from instructors and aides.[83]

In plaintiff's opinion, Christina's BSP "was not the right plan for her.  It didn't work."[84]  Among other deficiencies, Christina's BSP did not require that she receive one-on-one care as part of her treatment.[85]  Program Coordinator Kertrina Sharperson told plaintiff that the BSP had been created prior to Christina's transfer to plaintiff's classroom, and that it had not been updated.[86]

Christina's BSP listed "coloring, dancing . . . [and] 1:1 attention" as "reinforcers" for positive behavior.[87]  However, plaintiff admitted that Christina was not encouraged to engage in coloring or dancing, and that she was not always given one-on-one attention.[88]  By way of explanation, plaintiff alleged that defendant had too little staff to give Christina constant one-on-one attention, and that Christina

---

[81] *Id.* at 76.

[82] *Id.* at 70 (alteration supplied).

[83] *Id.*; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 41-42.

[84] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 70.

[85] Doc. no. 23-1 (Deposition of Kertrina Sharperson), at 38-39.

[86] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 74.

[87] *Id.*, exhibit 5 (BSP), at ARC000090 (alteration supplied).

[88] *Id.* at 80-81, 87-88, 218.

"didn't like" plaintiff's classroom aides.[89]

Further, Christina's BSP did not expressly allow instructors to regulate Christina's behavior by instructing her to place her head on the desk and/or permitting her to fall asleep while class was in session.  However, on occasions when Christina became aggressive, plaintiff admitted that she asked Christina to put her head on the desk "to calm her down."[90]  Within approximately ten to fifteen minutes, Christina's behavior de-escalated, and she got back up and was "fine."[91]

Plaintiff denied issuing an instruction for Christina to go to sleep.[92]  Rather, plaintiff testified that Christina was often drowsy as a result of her medications, especially in the mornings.[93]  When Christina fell asleep, plaintiff attempted to interact with her in order to wake her up.[94]  Although this occasionally made Christina become aggressive, plaintiff understood that it was her job to continue to attempt to keep Christina awake.[95]  Further, plaintiff "didn't want to get in trouble with [Program Coordiator Sharperson] because [Christina] is laying there asleep."[96]

---

[89] *Id.*

[90] *Id.* at 60-21, 64.

[91] *Id.*

[92] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 60-21, 64.

[93] *Id.* at 51, 62.

[94] *Id.* at 60, 62, 67

[95] *Id.* at 67-68.

[96] *Id.* at 68 (alterations supplied).

However, plaintiff admitted that she "allowed [Christina] to stay asleep when she's having [an episode of negative or self-injurious] behavior."[97]   For example, plaintiff admitted that she told Gina Brand, an aide, not to interact with Christina when she was exhibiting negative behavior, because Brand irritated Christina, and plaintiff feared for Brand's safety.[98]

Likewise, plaintiff admitted that she told Victoria Evans, another aide, to allow Christina to put her head on the desk and not attempt to wake her up when she was exhibiting such behavior.[99]   Evans attested that:

> [Plaintiff] and Christina were usually in the classroom before me and Christina normally had her head down on a table on top of a paper towel when I arrived.  There were multiple occasions when Christina put her head up (other than when necessary to eat) and I heard [plaintiff] tell her to put her head back down on the table.  [Plaintiff] told me more than one time to leave Christina alone in order to avoid negative behavior. Although Christina would sometimes fall asleep, she did not sleep all day and I often saw her awake with her head flat on a table as she was told to do.  I knew that the Behavior Support Plan for Christina contained instructions on how to interact with her and that it did not include instructions that she should be told to put her head on a table or that she should be encouraged to sleep.[100]

Although plaintiff designated the Evans affidavit as "disputed," she did not identify

---

[97] *Id.* (alterations supplied).

[98] Doc. no. 22-1 (Deposition of Sheba Rhodes)*, at 65.

[99] *Id.* at 64.

[100] Affidavit of Victoria Evans ¶ 5 (alterations supplied).

the portions with which she disagreed.[101]   Indeed, plaintiff specifically admitted many of the facts Evans alleged.[102]   Plaintiff did, however, deny personally instructing Christina to place her head on the desk, on top of a paper towel.[103]

Plaintiff testified that she believed her strategy of managing Christina's behavior by instructing her to put her head on the desk to be consistent with the following instructions from Christina's BSP:  "If something is irritating Christina in her environment, remove the item. . . . If Christina needs a break from a task then give her a break and try again after she has calmed down."[104]

In contrast to plaintiff's interpretation of Christina's BSP, Executive Director Susan Klingel indicated that, much like using physical intervention, the act of instructing a client to place her head on the desk, or to go to sleep is a negative strategy that "ha[s] to go through a team [of mental health professionals] and . . . be part of the Behavior Support Plan" before it can be used.[105]

Klingel also testified that "[a]t no point in time in any behavior management plan would somebody tell [a client] to put their head down on the table or go to

---

[101] Doc. no. 24 (Response in Opposition to Motion for Summary Judgment), at 4-5.

[102] *See, e.g.,* footnotes 90-99.

[103] Doc. no. 22-1 (Deposition of Sheba Rhodes)*, at 61.

[104] *Id.* at 205-206, and exhibit 5 (BSP), at ARC000092.

[105] *See* doc. no. 22-3 (Deposition of Susan Klingel), at 47 (alterations supplied).

sleep."[106]   Likewise, Medicaid Program Coordinator Roslyn Bridges testified that defendant does not encourage the behavior management strategy of instructing a client to go to sleep.[107]

### 3.    Alleged Knowledge of Plaintiff's Conduct by Defendant's Employees

Plaintiff offered evidence that several of defendant's employees often instructed Christina to place her head on the desk, on top of a paper towel, either for purposes of hygiene or in order to address her episodes of aggressive or self-injurious behavior.[108]  Those employees included:  Aide Freddie Dowdell; plaintiff's supervisor, Qualified Mental Retardation Professional Ann Finley; and even Program Coordinator Kertrina Sharperson who, in fact, allegedly introduced the challenged practice.[109]

Plaintiff testified that Aide Dowdell frequently instructed Christina to put her head on the desk, on top of a paper towel, "because [Christina] slobbered on the table, and they didn't want the slob on the table."[110]   Plaintiff allegedly twice instructed Dowdell to stop using a paper towel "[b]ecause it was making [Christina] comfortable to sleep[,] [a]nd I was instructed by my supervisor not to let her sleep like that," but

---

[106] *Id.* at 56, 69 (alterations supplied).

[107] Doc. no. 23-2 (Deposition of Roslyn Bridges), at 103-04; *see also* doc. no. 23-1 (Deposition of Kertrina Sharperson), at 61-62.

[108] *See* doc. no. 22-1 (Deposition of Sheba Rhodes)*,* at 61-62; doc. no. 25-1 (Affidavit of Constance Jones) ¶ 8.

[109] *Id.*

[110] Doc. no. 22-1 (Deposition of Sheba Rhodes)*,* at 61-62 (alterations supplied).

in spite of her instructions, Dowdell continued the practice.[111]

Plaintiff also submitted an affidavit from Constance Jones, a former aide, who attested that she had

> personally observed [plaintiff's supervisor,] Ann Finley, a QMRP at the time, and [Program Coordiantor] Kertrina Sharperson, place Christina's head down on the table in the classroom as a way of calming Christina down.  In fact, Kertrina Sharperson was the first Arc employee to start the practice of placing a paper towel on the table and having Christina place her head down on the table, as a method of dealing with Christina's violent behavior.  Once [Sharperson] started this approach, she did it almost every day because Christina would act violent almost every day, or she also instructed [plaintiff], myself and others to act in this manner with Christina.[112]

Executive Director Susan Klingel denied personal awareness that any of defendant's employees were instructing Christina to put her head on the desk, either with or without a paper towel.[113]

Plaintiff also testified that she repeatedly told Program Coordinator Sharperson and plaintiff's supervisor, QMRP David Lane, that Christina's medication was causing her to fall asleep in class.[114]  Further, plaintiff alleged that Sharperson often visited her classroom, and frequently observed that Christina had fallen asleep with

---

[111] *Id.* at 118 (alterations supplied); *see also id.* at 98.

[112] Doc. no. 25-1 (Affidavit of Constance Jones) ¶ 8 (alterations supplied).

[113] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶¶ 15, 17.

[114] Doc. no. 22-1 (Deposition of Sheba Rhodes)*,* at  51-52; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 68.

her head on the desk, but that Sharperson did not report these occurrences as a violation of defendant's policies.[115]

Program Coordinator Sharperson denied frequent visits to plaintiff's classroom, and testified that, on those occasions when she saw "Christina with her head on the desk," she "instructed staff to get her up, move her around, [and encourage her to] interact with the other individuals."[116]  Sharperson also stated that she was "not aware that [Christina] was being *told* to lay her head down and to sleep."[117]

In addition, plaintiff testified that she told Program Coordinator Sharperson that Christina did not like one of the aides, Gina Brand.[118]  Plaintiff did not, however, raise the issue with a QMRP, who could have written a "file note" and possibly removed Brand from the classroom.[119]  Executive Director Susan Klingel denied that she was aware of any problems between Christina and Brand.[120]

## E.   Defendant's Investigation of Plaintiff's Conduct

### 1.   The complaint by Aide Gina Brand to Program Coordinator Kertrina Sharperson

---

[115] Doc. no. 22-1 (Deposition of Sheba Rhodes)*,* at 51-52, 62, 124-25, 202-03; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 66.

[116] Doc. no. 23-1 (Deposition of Kertrina Sharperson), at 66 (alterations supplied).

[117] *Id.* (alteration and emphasis supplied).

[118] Doc. no. 22-1 (Deposition of Sheba Rhodes)*,* at 65-66.

[119] Doc. no. 22-3 (Deposition of Susan Klingel), at 58.

[120] *Id.*

24

The parties present two different versions of the events that led to the complaint against plaintiff by Aide Gina Brand to Program Coordinator Kertrina Sharperson.

According to defendant, Brand approached Sharperson on August 5, 2010 in order to report the actions of Aide Constance Jones.[121]  In the process of reporting Jones' misconduct, Aide Brand raised a separate "question" regarding the appropriateness of plaintiff's practice of instructing Christina to place her head on the desk, of allowing her to fall sleep while class was in session, and of discouraging aides from interacting with her one-on-one.[122]  Plaintiff disputes the evidence of Brand's statements as inadmissible hearsay.[123]  *See* Section III, *infra*.

Defendant alleges that Program Coordinator Sharperson responded to Aide Brand's inquiry by stating that plaintiff's methods "were *not* a correct way of dealing with Christina, because sleep is never encouraged and clients are at the Arc for affirmative interaction, not isolation or rest."[124]  Sharperson then told Brand that they "needed to report this matter to [Medicaid Program Coordinator] Roslyn Bridges for a complete investigation pursuant to the Arc's abuse, neglect and mistreatment policy."[125]

---

[121] Doc. no. 23-4 (Affidavit of Kertrina Sharperson) ¶¶ 1, 6.

[122] *Id.* ¶ 7.

[123] Doc. no. 24 (Response to Motion for Summary Judgment), at 8.

[124] Doc. no. 23-4 (Affidavit of Kertrina Sharperson) ¶ 7 (emphasis supplied).

[125] *Id.* (alteration supplied)

In contrast, plaintiff alleges that Program Coordinator Sharperson and plaintiff's supervisor, Qualified Mental Retardation Professional Ann Finley, coerced Aide Brand into making a complaint after Christina became violent and struck another client.[126]  While plaintiff was attending a doctors' appointment on August 15, 2010, Christina became upset with Brand, who moved away from Christina and toward another client, Julia.[127]  Christina then physically attacked Julia, and Aide Constance Jones had to intervene to break up the fight.[128]

As a result of the incident, Program Coordinator Sharperson and QMRP Finley were allegedly called into plaintiff's classroom, Aides Brand and Jones completed reports for inclusion in Christina's client file, and Brand reported that Christina had physically assaulted her.[129]  After the incident had been documented, plaintiff arrived at work, and Brand and Jones informed plaintiff of what had transpired.[130]  Plaintiff explained Christina's behavioral problems to Brand, and Brand told plaintiff and Jones that she did not like three of defendant's clients: *i.e.*, John, Maria, and Christina.[131]

---

[126] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 54, 133, 139-40.

[127] Doc. no. 25-1 (Affidavit of Constance Jones) ¶ 6.

[128] *Id.*

[129] *Id.*

[130] *Id.* ¶¶ 6-7.

[131] *Id.* ¶ 7.

Aide Brand then allegedly took her lunch break, but repeatedly returned to plaintiff's classroom to inform plaintiff and Aide Jones that Program Coordinator Sharperson and QMRP Finley were trying to convince her to "snitch" on them by reporting activities in plaintiff's classroom.[132]  Brand also told plaintiff and Jones that Sharperson and Finley had assured her that neither plaintiff nor Jones would be present in plaintiff's classroom the following day.[133]

Aide Brand then allegedly left the room, but returned to tell plaintiff and Aide Jones that Program Coordinator Sharperson and QMRP Finley were putting her up to saying something she did not want to say, and that if she had to be a "snitch," she would quit her job.[134]  Brand also stated that Jones had thrown Christina and another client, Jeff, into a chair, and that Finley was watching Jones through the window of plaintiff's classroom.[135]   (It is not clear whether Brand alleged that Finley was watching *while* Jones allegedly threw the clients into chairs.)  Jones denied throwing either client.[136]

Later, Program Coordinator Sharperson allegedly instructed Aide Jones to speak to Medicaid Program Coordinator Roslyn Bridges about Jones's request for

---

[132] *Id.*

[133] Doc. no. 25-1 (Affidavit of Constance Jones) ¶ 7.

[134] *Id.*

[135] *Id.*

[136] *Id.*

family leave.[137]   Jones denied requesting family leave, but she apparently went to Bridges's office accompanied by Sharperson.[138]  Once Jones and Sharperson arrived at Bridges's office, Sharperson laughed at Jones and told her that Bridges wanted to speak with her, and that Jones should have a seat.[139]

Medicaid Program Coordinator Bridges informed Aide Jones that she was accused of abusing two clients, Christina and Jeff.  She then obtained Jones's written statement responding to the allegations, and suspended Jones with pay.[140]  Later that day, Jones tendered her resignation, because she believed that she "was being singled out and harassed and well as falsely accused of two incidents."[141]  Defendant disputes the evidence of statements to Jones as inadmissible hearsay.[142]  *See* Section IV, *infra*.

## 2.    The placement of plaintiff on administrative leave

On the day that Aide Gina Brand informed Program Coordinator Kertrina Sharperson about plaintiff's practice of instructing Christina to place her head on the desk while class was in session, defendant suspended plaintiff pending the results of an investigation by Medicaid Program Coordinator Roslyn Bridges,[143] who ran

---

[137] *Id.*

[138] *Id.*

[139] Doc. no. 25-1 (Affidavit of Constance Jones) ¶ 7.

[140] Doc. no. 25-1 (Affidavit of Constance Jones), exhibit A (Jones E-Mail), at 8.

[141] *Id.*

[142] Doc. no. 29 (Motion to Strike Portions of the Affidavit of Constance Jones).

[143] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 42, 45, 93-94.

defendant's adult day program.[144]

The incident report showing plaintiff's placement on administrative leave was signed by Program Coordinator Sharperson.[145]   Accordingly, plaintiff alleged that *Sharperson* placed her on administrative leave.[146]   However, Klingel testified that *Bridges* was responsible for putting employees on administrative leave,[147] and Sharperson attested that *her* (Sharperson's) involvement was limited to completing the incident report as required by law.[148]

### 3.     The investigation by Medicaid Program Coordinator Roslyn Bridges

As noted in Section II(A), *supra*, Medicaid Program Coordinator Roslyn Bridges ran the day program, and investigated allegations of client abuse, neglect, and mistreatment when assigned to do so by Executive Director Susan Klingel.[149]   Bridges received informal, telephonic training on performing such investigations by requesting recommendations regarding her first investigation from an Advocate for the Alabama

---

[144] Doc. no. 23-2 (Deposition of Roslyn Bridges), at 7-8, 10; doc. no. 22-3 (Deposition of Susan Klingel), at 11-12.

[145] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 6 (Investigation Report).

[146] Doc. no. 24 (Response in Opposition to Motion for Summary Judgment), at 25.

[147] Doc. no. 22-3 (Deposition of Susan Klingel), at 21.

[148] Doc. no. 23-4 (Affidavit of Kertrina Sharperson) ¶ 8.

[149] Doc. no. 23-2 (Deposition of Roslyn Bridges), at 7-8, 10; *see also* doc. no. 22-3 (Deposition of Susan Klingel), at 11-12.

29

Department of Mental Health who was in the process of retiring from his position.[150]

By the time of her deposition, Bridges had conducted ten to twenty investigations.[151]

As part of her investigation of the allegations by Aide Gina Brand against plaintiff, Medicaid Program Coordinator Bridges took a written statement from Brand, who reported that she "was told [by plaintiff] not to interact with Christina," and "was informed the less interaction [with Christina,] the better."[152]  Brand also reported that Christina was "made [by plaintiff] to lay her head down and sleep as much as possible," and that "when I tried to talk and interact [with Christina,] I was told to stop and move on to the next client."[153]

Upon receiving Aide Brand's report, Medicaid Program Coordinator Bridges preliminarily categorized the conduct under investigation as "mistreatment."[154] Bridges asked plaintiff to write a statement responding to Brand's allegations. Plaintiff wrote that she had, in fact, told Brand "not to say certain things around

---

[150] Doc. no. 23-2 (Deposition of Roslyn Bridges), at 14-16; Doc. no. 22-3 (Deposition of Susan Klingel), at 28.

[151] Doc. no. 23-2 (Deposition of Roslyn Bridges), at 16.

[152] Doc. no. 23-3 (Affidavit of Susan Klingel), exhibit A (Witness Statements) (alterations supplied); *see also* doc. no. 23-2 (Deposition of Roslyn Bridges), at 23-24.

[153] Doc. no. 23-3 (Affidavit of Susan Klingel), exhibit A (Witness Statements) (alterations supplied).

[154] Doc. no. 23-2 (Deposition of Roslyn Bridges), at 106.

Christina because she will get fixated on certain things you say,"[155] and "that the less she say to Christina the better she will be because if you keep saying things to her she will try to fight and behaviors will escalate."[156]

Additionally, Program Coordinator Kertrina Sharperson assembled a list of employees for Medicaid Program Coordinator Bridges to interview.[157]   Bridges then obtained written answers to a series of questions from all nine aides who worked in plaintiff's classroom with Christina.[158]   However, she did not speak to Sharperson, or plaintiff's supervisors, Qualified Mental Retardation Professionals David Lane and Ann Finley, or anyone responsible for designing Christina's Behavior Support Plan.[159]

Three aides denied witnessing the acts under investigation.   Donna Davis, Wilma Emerson, and Daphne Garner each gave a written statement denying that they had heard plaintiff instruct Christina to go to sleep, and denying that they had heard plaintiff tell staff not to interact with Christina.[160]

Another six aides, however, acknowledged that they had heard plaintiff instruct

---

[155] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 6 (Investigation Report), at ARC000102.

[156] Doc. no. 23-3 (Affidavit of Susan Klingel), exhibit A (Witness Statements); *see also* doc. no. 23-2 (Deposition of Roslyn Bridges), at 30.

[157] *See* doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 6 (Investigation Report).

[158] *Id.*; doc. no. 23-2 (Deposition of Roslyn Bridges), at 25.

[159] *See* doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 6 (Investigation Report).

[160] *Id.*

Christina to place her head on the desk, and that they had heard plaintiff tell the staff to allow Christina to sleep and/or not to interact with her.  Each of those statements is briefly summarized below.

Aide Freddie Dowdell wrote that, "[w]hen Christina come to school in a bad mood, [plaintiff] would tell her or I should say make her lay her head down and she would eventually go to sleep, or quiet down."[161]

Aide Victoria Evans wrote that, "[n]ormally, by the time I went to room 12, Christina was already laying her head down.  When I would come there and she was up, she was instructed to lay her head down."[162]  Evans then noted parenthetically that "[plaintiff] instructed her."[163]  In response to Bridges's question regarding whether plaintiff had instructed Evans to allow Christina to sleep, Evans answered that, "[o]ne time before Christina began to have [an episode of negative or self-injurious] behavior I was instructed to place a paper towel on the table and for her to rest her head on the paper towel to calm down."[164]  Evans then stated that she "was instructed by [plaintiff] not to interact with Christina [and] to let her rest."[165]

---

[161] Doc. no. 23-3 (Affidavit of Susan Klingel), exhibit A (Witness Statements) (alteration supplied).

[162] *Id.* (alteration supplied).

[163] *Id.* (alteration supplied).

[164] *Id.* (alteration supplied).

[165] *Id.* (alterations supplied).

In response to Bridges's question regarding whether plaintiff had instructed Aide Connie Laster to allow Christina to sleep, Laster answered, "yes if [Christina] is in one of her bad moods."[166]  Laster then alleged that plaintiff had also used that method "when [Christina] was obsessing over Alvin and the Chipmunks."[167]

Aide Michelle Timmons answered "yes" to a question regarding whether plaintiff had instructed her to allow Christina to sleep, and "yes" to a question regarding whether she had also been instructed not to interact with Christina.[168] Timmons answered "no" to the question, "Have you ever seen [plaintiff] make Christina to lay her head down by putting her hand on Christina's head and push[ing] her head down?" but noted that she had "heard [plaintiff] tell Christina to put her head down."[169]

Aide Donna Davis was asked whether plaintiff had instructed her to allow Christina to sleep, and answered, "yes she instructed [Christina] to la[y] her head down."[170]

Aide Beth Meager answered "yes" to a question asking whether plaintiff had

---

[166] *Id.* (alteration supplied).

[167] Doc. no. 23-3 (Affidavit of Susan Klingel), exhibit A (Witness Statements) (alteration supplied).

[168] *Id.*

[169] *Id.* (alterations supplied).

[170] *Id.* (alterations supplied).

instructed her to allow Christina to sleep.[171]

Eventually, Medicaid Program Coordinator Bridges incorporated the nine witness statements into her investigative report for the Alabama Department of Mental Health.[172]  Bridges's investigation did not yield sufficient evidence to conclude that plaintiff committed "*mistreatment*" (Bridges's original designation for Aide Brand's allegations), but did yield sufficient evidence to conclude that plaintiff's "behavior of failing to follow the approved behavior plan for [Christina] was *neglectful*."[173] Defendant did not investigate the way in which Program Coordinator Sharperson or QMRPs Lane and Finley treated Christina, and did not subject those individuals to disciplinary action.[174]

### 3.    The decision to terminate plaintiff's employment

After Medicaid Program Coordinator Roslyn Bridges completed her investigation, but before she completed her report, Bridges provided Executive Director Susan Klingel with all the evidence, including the nine witness statements, regarding Aide Gina Brand's allegations for the purpose of allowing Klingel to make

---

[171] *Id.*

[172] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 6 (Investigation Report), at ARC000099.

[173] *Id.* (alterations and emphasis supplied).

[174] *Id.*

a decision regarding the appropriateness of disciplinary action against plaintiff.[175] Ultimately, Klingel decided to terminate plaintiff's employment because she did not follow Christina's BSP, and because she acted in a manner that constituted "neglect" under defendant's policies.[176]

As an explanation for the decision, Executive Director Klingel testified that plaintiff "did not even attempt to follow [Christina's] behavior [support] program. She went ahead and did what she wanted to do, which was to tell [Christina] to sleep and put her head down."[177]   Klingel categorized that practice as "isolation [because Christina was] not getting any interaction."[178] Klingel found the practice inconsistent with defendant's goal of assisting clients to improve their behavior and increase their normalization into the community.  She also "considered [the practice] to be neglect" under defendant's policies.[179]

Medicaid Program Coordinator Bridges gave plaintiff a termination notice signed by Executive Director Klingel on August 12, 2010, four days before plaintiff was scheduled to begin her FMLA leave (August 16, 2010), and six days before

---

[175] Doc. no. 22-3 (Deposition of Susan Klingel), at 100-01; doc. no. 23-3 (Affidavit of Susan Klingel) ¶¶ 9-10; doc. no. 23-2 (Deposition of Roslyn Bridges), at 91.

[176] Doc. no. 22-3 (Deposition of Susan Klingel), at 45, 65-66; doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 13.

[177] Doc. no. 22-3 (Deposition of Susan Klingel), at 72 (alterations supplied).

[178] *Id.* at 59 (alteration supplied).

[179] *Id.* at 56 (alteration supplied).

Bridges completed her investigation report (August 18 of the same year).[180]  The termination notice stated that "[y]our failure to comply with the established behavior strategy steps was neglectful and had a detrimental effect on the individual."[181] Plaintiff signed the termination notice with the words "Refused to Sign" because she "didn't think it was neglect."[182]

Medicaid Program Coordinator Bridges denied knowing that plaintiff had either applied for or been approved for FMLA leave until after her termination.[183]  Even so, Executive Director Klingel, Program Coordinator Kertrina Sharperson, and plaintiff's supervisor, Qualified Mental Retardation Professional Ann Finley, were each aware that plaintiff had been approved for FMLA leave prior to her termination.[184] Nevertheless, Klingel attested that she did not consider information related to plaintiff's FMLA status in making the ultimate termination decision.[185]

Additionally, plaintiff testified that Program Coordinator Sharperson influenced

---

[180] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 3 (Termination Notice); exhibit 4 (2010 Request for FMLA Leave); exhibit 6 (Investigation Report).

[181] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 29, and exhibit 3 (Termination Notice); doc. no. 22-3 (Deposition of Susan Klingel), at 18 (alteration supplied).

[182] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 57.

[183] Doc. no. 23-2 (Deposition of Roslyn Bridges), at 91.

[184] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 34-36; doc. no. 22-3 (Deposition of Susan Klingel), at 87-88; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 80, 84.

[185] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 15.

Executive Director Klingel's decision to terminate plaintiff's employment.[186] Plaintiff also testified that Sharperson claimed to have terminated employees in the past.[187] However, Klingel testified that she is defendant's ultimate decision-maker on hiring and firing,[188] and that she made the decision to terminate plaintiff's employment without input from either Medicaid Program Coordinator Bridges or Sharperson.[189]

## F.   Plaintiff's Surgeries

Despite her termination on August 12, 2010, plaintiff continued to receive health insurance coverage until September 1 of that year.[190]  Accordingly, plaintiff had insurance coverage for her surgery on August 16, 2010, for which she had originally requested FMLA leave.[191]  Plaintiff also owes nothing for a second surgery on September 18 of that year.[192]

## G.   After-Acquired Evidence of Plaintiff's Violations of Defendant's Policies

### 1.   Plaintiff's failure to disclose her criminal conviction on her employment application

---

[186] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 27-28, 30-32, 165, 194, 197.

[187] *Id.* at 199.

[188] Doc. no. 22-3 (Deposition of Susan Klingel), at 10, 16, 102, 104; doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 15; doc. no. 22-1 (Deposition of Sheba Rhodes), at 30-31.

[189] Doc. no. 22-3 (Deposition of Susan Klingel), at 10, 16, 102, 104; doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 15.

[190] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 144-45, and exhibit 11 (COBRA Continuation Coverage Election Notice).

[191] *Id.* at 144.

[192] *Id.* at 150-52, and exhibit 12 (Patient Statement of Account).

On the date of plaintiff's deposition taken on February 3, 2012, Executive Director Susan Klingel learned that plaintiff had failed to disclose her criminal conviction when applying for employment on June 16, 2006.[193]   Plaintiff was convicted of a misdemeanor for "under-ringing" items (*i.e.*, ringing up products at a price that is less than actual price) during her employment as a cashier at Wal-Mart.[194] As part of her application, however, plaintiff answered "No" to the question, "Have you ever been convicted of a crime?"[195]   Plaintiff also signed a certification stating that "the facts contained in [the] application are true and complete."[196]

In light of the certification, plaintiff admitted that making a false statement on her employment application was grounds for her termination.[197]   Executive Director Klingel attested that "[defendant] considers false statements in applications very serious, and [Klingel] will not hire or retain individuals who make false statements."[198] Klingel also attested that, "[h]ad [she] known about [plaintiff's] falsification of her application at a time when she was applying for employment or employed by

---

[193] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 19; *see also* doc. no. 22-1 (Deposition of Sheba Rhodes), at 22, and exhibit 1(Employment Application).

[194] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 8-9, 22.  For a definition of "under-ringing," *see* http://www.termwiki.com/EN:under-ring.

[195] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 1(Employment Application), at 4.

[196] *Id.* (alteration supplied).

[197] *Id.* at 22-23.

[198] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 18 (alterations supplied).

[defendant], [Klingel] would have refused to hire [plaintiff] or terminated her employment."[199]

Plaintiff designated the testimony regarding her criminal conviction as "disputed" on the grounds that

> Defendant should have run a background check as part of the hiring process. (Alabama Dept. of Mental Health Division of Developmental Disabilities Administrative Code, Ch. 580-5-31-.02(5)(a) and 580-5-31-.02(5)(a) 2). Plaintiff admitted to a misdemeanor, not a felony. The judge told her misdemeanors don't show on her record. (Rhodes Depo., p. 22).[200]

Because plaintiff's *arguments* that defendant should have run a background check, and that a judge should have explained the significance of a misdemeanor, are not admissible *evidence* sufficient to dispute the allegation that she did not disclose her criminal conviction on her employment application, this court will treat plaintiff's coviction as admitted.

### 2. Plaintiff's failure to report violations of Behavior Support Plans ("BSPs")

Also on the date of plaintiff's February 3, 2012 deposition, Executive Director Susan Klingel learned that plaintiff had allegedly witnessed Program Coordinator Kertrina Sharperson violate Behavior Support Plans ("BSPs") "[n]umerous...times,"

---

[199] *Id.* ¶ 19 (alterations supplied).

[200] Doc. no. 24 (Response in Opposition to Motion for Summary Judgment), at 13.

and presumably for numerous clients, but did not report those violations in accordance with defendant's policies.[201]   Defendant's "Individual Abuse, Neglect, and Mistreatment Policy" states that "the failure to report suspected cases of individual abuse, neglect, or mistreatment (either physical or mental) for any reason, constitutes a serious neglect of duty on the part of the person witnessing the abuse, neglect, or mistreatment."[202]

In light of the policy, plaintiff admitted that failure to report the violation of a BSP was grounds for her termination.[203]   Executive Director Susan Klingel attested that "these failings on [plaintiff's] part would result in her termination if she was still employed by [defendant]."[204]

### III.  MOTION TO STRIKE PORTIONS OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant filed a motion requesting three separate forms of relief:  to hold that plaintiff has admitted some facts that defendant advanced in support of summary judgment; to strike other facts that plaintiff advanced in opposition to summary judgment; or, in the alternative, to provide guidance on the proper manner for

---

[201] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 20; *see also* doc. no. 22-1 (Deposition of Sheba Rhodes), at 190, 193 (alteration supplied).

[202] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 8 (Individual Abuse, Neglect, and Mistreatment), at 209.

[203] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 193 (alteration supplied).

[204] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 20 (alterations supplied).

defendant to formulate its response.[205] For the reasons explained below, the requests will be granted in part and denied in part.

## A. Motion to Hold Facts Admitted

Defendant first asks this court to hold that plaintiff has admitted defendant's undisputed facts numbered 68 and 69, which concern Program Coordinator Sharperson's response to Aide Gina Brand's "question" regarding the appropriateness of plaintiff's practices of instructing Christina to place her head on the desk, of allowing her to fall sleep while class was in session, and of discouraging aides from interacting with her one-on-one.[206] Defendant's allegedly undisputed facts numbered 68 and 69 state as follows:

> 68.    [Program Coordinator Kertrina] Sharperson attested that when [Aide] Gina Brand told her [plaintiff] was engaging in a practice of instructing Christina to place her head down and encouraging aides to leave her alone, she responded to Ms. Brand that "this was not a correct way of dealing with Christina, because sleep is never encouraged and clients are at the Arc for affirmative interaction, not isolation or rest. (Sharperson Aff., ¶ 7).

> 69.    [Program Coordinator] Sharperson testified that she immediately "indicated to Ms. Brand that [they] needed to report this matter to [Medicaid Program Coordinator] Roslyn Bridges for a complete investigation pursuant to the Arc's abuse, neglect and

---

[205] Doc. no. 26 (Motion to Strike Portions of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment).

[206] *See* doc. no. 23-4 (Affidavit of Kertrina Sharperson) ¶ 7.

mistreatment policy." (*Id.*).[207]

Plaintiff responded to those statements as follows:

68. Disputed. This statement has not been corroborated by [Aide]
Gina Brand.

69. Disputed to the extent this statement has not been corroborated by
Gina Brand.[208]

Defendant argues that "plaintiff disputed the facts but did not provide citation
to any materials from the record to support the dispute. (*Id*. at 8). Accordingly,
pursuant to this Court's Uniform Initial Order, [defendant's] statements of fact no. 68
and 69 are due to be admitted."[209]   Plaintiff concedes that her response omits any
citation to the record, but contends that:

Defendant's alleged facts nos. 68 and 69 contain alleged statements
made by [Aide] Gina Brand, which are hearsay, and Plaintiff disputes the
statements to that extent. Plaintiff did not dispute [Program Coordinator]
Sharperson's testimony, merely the portion that is hearsay. The cites
were inadvertently left off, but are identical to the Defendant's:
Sharperson Aff., ¶7.[210]

Indeed, Program Coordinator Sharperson's allegation that Aide Brand "told her

[plaintiff] was engaging in a practice of instructing Christina to place her head down

---

[207] Doc. no. 21 (Brief in Support of Motion for Summary Judgment), at 12-13 (alterations
supplied).

[208] Doc. no. 24 (Response to Motion for Summary Judgment), at 8 (alterations supplied).

[209] Doc. no. 26 (Motion to Strike Portions of Plaintiff's Response in Opposition to
Defendant's Motion for Summary Judgment), at 3 (alteration supplied).

[210] Doc. no. 31 (Response to Motion to Strike Portions of Plaintiff's Response in Opposition
to Defendant's Motion for Summary Judgment), at 2.

and encouraging aides to leave her alone" is hearsay, and does not fall within an exception that would permit its admission.[211]  This court thus holds that, with the exception of that portion of defendant's undisputed fact numbered 68, defendant's undisputed facts numbered 68 and 69 are deemed to have been admitted.

## B.    Motion to Strike or, in the Alternative, for Further Court Guidance

Defendant next asks this court to strike plaintiff's additional undisputed facts, with the exception numbers 2, 3, 7, 11, 12, 16 and 34, on the grounds that they "fail to comport with this Court's requirement that they be set out in separately numbered paragraphs.  At the very least, The Arc requires guidance from this Court as to how to formulate responses."[212]

Although it is true that many of the allegedly undisputed facts that were advanced by *both* parties are not set out in separately numbered paragraphs, the parties have responded to each others' briefs,[213] and this court has managed to parse those responses.    Accordingly, the motion to strike plaintiff's additional, allegedly undisputed facts is denied as moot.

## IV.  MOTION TO STRIKE PORTIONS OF THE AFFIDAVIT OF

---

[211] Doc. no. 21 (Brief in Support of Motion for Summary Judgment), at 12 (alteration supplied).

[212] Doc. no. 26 (Motion to Strike Portions of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment), at 5.

[213] *See* doc. no. 21 (Brief in Support of Motion for Summary Judgment); doc. no. 24 (Response to Motion for Summary Judgment).

## CONSTANCE JONES

Defendant moves to strike the principal part of the only evidence that plaintiff provides in opposition to summary judgment: *i.e.*, a portion of the affidavit of Constance Jones, an aide formerly employed by defendant, and the entire attached exhibit (an electronic mail ("e-mail") message sent by Jones to Executive Director Susan Klingel and others to tender her resignation and inform them of her rationale for leaving her employment at The Arc).[214]   For the reasons explained below, defendant's motion to strike will be granted.

### A.      Summary of Former Aide Constance Jones's E-Mail and Affidavit

As noted in Section II(E)(1), *supra*, Aide Jones resigned her position under acrimonious circumstances:  she was suspended on an accusation that she had abused two clients, including Christina, and she believed that she "was being singled out and harassed and well as falsely accused of [those] two incidents."[215]   Jones's nine-page, single-spaced e-mail explaining her reasons for leaving contained scandalous accusations of misconduct by various members of defendant's staff toward plaintiff and Jones, many of which are not germane to this action.[216]   In order to place the e-mail into context, this discussion will briefly summarize Aide Jones's claims.

---

[214] Doc. no. 29 (Motion to Strike Portions of the Affidavit of Constance Jones).

[215] Doc. no. 25-1 (Affidavit of Constance Jones), exhibit A (Jones E-Mail), at 8.

[216] *See id.*, exhibit A (Jones E-Mail).

Among other things, Jones alleged that Program Coordinator Kertrina Sharperson and Qualified Mental Retardation Professionals David Lane and Ann Finley falsely accused her of "making a pass" at the husband of Instructor Tangela Gardner in church, and wrote her up for gossiping about the incident.[217]  Jones also alleged that Gardner took clients to various unauthorized locations in order to permit Gardener to conduct her personal affairs and purchase food stamps, clothing, and lottery tickets.[218]  However, when Jones reported Gardner to Sharperson and Finley, neither supervisor took action.[219]

Additionally, Jones alleged that she was regularly physically assaulted by the clients, that her supervisors would refuse to assist with restraining violent clients, and that QMRP Finley stated that rendering such assistance was not in her job description.[220]  Further, Jones alleged that, when she complained about Finley and Program Coordinator Sharperson to Medicaid Program Coordinator Roslyn Bridges, Sharperson and Finley asked Jones why she was talking to white people about her business.[221]  Jones also alleged that, after she injured her leg in an on-the-job accident, Sharperson ordered her to continue performing strenuous physical tasks, and to stop

---

[217] *Id.*, exhibit A (Jones E-Mail), at 8.

[218] *Id.*, exhibit A (Jones E-Mail), at 14.

[219] *Id.*, exhibit A (Jones E-Mail).

[220] *Id.*, exhibit A (Jones E-Mail).

[221] Doc. no. 25-1 (Affidavit of Constance Jones), exhibit A (Jones E-Mail), at 14-15.

using crutches or attending physical therapy.[222]

In addition to making a plethora of claims that are not pertinent to this case, the e-mail from Aide Jones addresses one relevant subject: *i.e.*, the events allegedly precipitating the complaint against plaintiff by Aide Brand to Program Coordinator Sharperson.  Briefly, the Jones e-mail alleges that Brand was coerced by Sharperson and QMRP Finley into making the complaint after Christina became violent and struck another client.[223]  *See* Section II(E)(1), *supra*.

The affidavit from Aide Jones restates her claims regarding the events precipitating the complaint against plaintiff by Aide Brand to Program Coordinator Sharperson: *i.e.*, that the complaint was coerced by Sharperson and QMRP Finley.[224] The affidavit then makes the additional contention that Sharperson introduced the practice of instructing Christina to place her head on the desk, and that Finley adopted the practice.[225]

## B.   Motion to Strike

Defendant moves to strike the following lengthy paragraph from former Aide Constance Jones's affidavit:

---

[222] *Id.*, exhibit A (Jones E-Mail), at 9-10.

[223] *Id.*, exhibit A (Jones E-Mail), at 11-14.

[224] Doc. no. 25-1 (Affidavit of Constance Jones) ¶¶ 6-7.

[225] *Id.* ¶ 8.

After the incident [involving Christina's physical assault on another client, Julia] had been taken care of and documented, [plaintiff] came into the room and asked [Aide Constance Jones] and [Aide] Gina Brand what was going on. [Constance Jones] told [plaintiff] what happened in front of Gina Brand. [Plaintiff] read the file notes and talked to [Brand and Jones]. [Brand] told [plaintiff], "now I know what you mean about Christina." The air conditioner was not working. [Jones] asked [plaintiff] if [they] could go to the cafeteria. [Plaintiff] said she would have to ask permission first. [Plaintiff] began explaining to [Brand], Christina's behavioral problems. [Brand] then told [plaintiff] and [Jones] that she did not like [three of defendant's clients: i.e.,] John, Maria, or Christina. [Plaintiff] and [Jones] listened to [Brand's] complaint. [Plaintiff, Brand, and Jones] moved to the cafeteria. [Brand] went to break, and every time she came back to the room she would tell [plaintiff and Jones] a different story that [QMRP] Ann [Finley] & [Program Coordinator] Kertrina [Sharperson] were trying to get her to snitch on [plaintiff] and [Jones]. [Sharperson and Finley] wanted [Brand] to tell them what goes on in [plaintiff's classroom,] room 12. [Brand's] story kept changing. [Brand] told [plaintiff and Jones] that [Sharperson] and [Finley] assured her that [plaintiff] nor [Jones] would be in [plaintiff's classroom] tomorrow. [Plaintiff] told [Brand], "what is there to snitch about? No one has done anything wrong." [Brand] left the room for her lunch, and this time she came back and told [plaintiff and Jones] that [Sharperson] and [Finley] were putting her up to saying that something that she did not want to say and that if she had to be a snitch that she would quit her job first. [Plaintiff] began asking [Brand] what was she talking about. [Jones] got up and took [a client,] Julia[,] to [another classroom] to change her undergarments. When [Jones] returned, [plaintiff] told [Jones] that [Brand] said that [Jones] had thrown Christina and [another client,] Jeff[,] down in a chair and Ann Finley was watching [Jones] through the window in [plaintiff's classroom]. [Jones] told [Plaintiff] that [she] never threw either client in a chair. [Jones] later was asked by [Sharperson] to go see [Medicaid Program Coordinator] Roslyn [Bridges] about [Jones's] family leave form, that [Jones] had allegedly put in. [Jones] told [Sharperson] that [she] did not have a leave form put in. Once [Jones] left the classroom and got to the office, [Sharperson] laughed at [Jones] and told [her] that Roslyn Bridges

wanted to speak with [Jones] and [Jones] was asked to have a seat.[226]
Defendant also moves to strike the e-mail sent by Aide Jones to explain her decision to resign from her position at The Arc.[227]

Defendant argues that the foregoing affidavit paragraph and the entire attached e-mail constitute inadmissible hearsay.[228]  Plaintiff attempts to render the evidence admissible by characterizing it as a party admission, a business record, a present sense impression, an excited utterance, and a statement showing a then-existing state of mind.[229]  Additionally, plaintiff argues that the evidence is not hearsay because she does not offer it to prove the truth of the matter asserted.[230]

Plaintiff first deems Aide Jones's affidavit and e-mail to constitute party admissions because "[Aide] Jones, [Aide] Brand and [plaintiff] were all employees at the time of the events recounted by Ms. Jones in her affidavit, and the discussions were about matters within the scope of that relationship."[231]  A statement qualifies as a party admission on the grounds that its author is the opposing party's employee if

---

[226] Doc. no. 29 (Motion to Strike Portions of the Affidavit of Constance Jones), at 2-4; *see also* doc. no. 25-1 (Affidavit of Constance Jones) ¶ 7 (alterations supplied).

[227] Doc. no. 29 (Motion to Strike Portions of the Affidavit of Constance Jones), at 4.

[228] *Id.*

[229] Doc. no. 24 (Response in Opposition to Motion to Strike Portions of the Affidavit of Constance Jones), at 2-4.

[230] *Id.* at 4.

[231] Doc. no. 24 (Response in Opposition to Motion to Strike Portions of the Affidavit of Constance Jones), at 2-3 (alterations supplied).

the statement is "offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship *and while it existed*." Fed. R. Evid. 801(d)(2)(D) (emphasis supplied).  The first sentence of the e-mail sent by Aide Jones states that she thereby *resigns* from her position at The Arc.[232]  It is self-evident that an e-mail tendering an employee's resignation is not a statement made within the scope of the employment relationship *while it exists*, regardless of whether the e-mail concerns events that occurred within the scope of that relationship. In *Young v. James Green Management, Inc.*, 327 F.3d 616 (7th Cir. 2003), the Seventh Circuit confronted the question of whether a resignation letter constituted an employer's party admission, and concluded that the letter was not admissible as a result of a "fundamental deficiency":

> [The employee] was not speaking as an employee on behalf of [the employer] when he resigned from his employment and accused [the employer] of racial discrimination; to the contrary, in a very overt manner, [the employee] was acting not only independently of [the employer] but also as its adversary.  Because [the employee's] out-of-court statement was made in the context of terminating his employment (and placing himself in an adversarial relationship with [the employer]), the justification for Rule 801(d)(2)(D) does not exist because [the employee] no longer was inhibited by his relationship with the principal from making erroneous or underhanded comments which could harm the principal.

*Id.* at 622-23 (internal quotations omitted) (alterations supplied).

---

[232] Doc. no. 25-1 (Affidavit of Constance Jones), exhibit A (Jones E-Mail), at 8.

49

Aide Jones's affidavit was notarized on April 16, 2012, *i.e.*, nearly two years *after* she resigned her employment via e-mail on August 17, 2010.[233]  Accordingly, neither the affidavit nor the e-mail is a statement made within the scope of the employment relationship *while it existed*, and neither is admissible as a party admission.

Plaintiff next argues that Aide Jones's e-mail constitutes a business record because it "was made by her pursuant to defendant's complaint policy and was kept in the ordinary course of business by defendant as part of its investigation into her complaints."[234]  A statement qualifies as a record of a regularly conducted activity if it records an act, event, condition, opinion, or diagnosis and

(A)   the record was made at or near the time by — or from information transmitted by — someone with knowledge;

(B)   the record was kept *in the course of a regularly conducted activity* of a business, organization, occupation, or calling, whether or not for profit;

(C)   making the record was *a regular practice of that activity*;

(D)   all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

---

[233] *See id.* at 5, and exhibit A (Jones E-Mail), at 7.

[234] Doc. no. 24 (Response in Opposition to Motion to Strike Portions of the Affidavit of Constance Jones), at 3.

(E)    neither the source of information nor the method or circumstances
       of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6) (emphasis supplied).  "For [the business record] exception to be

available, all persons involved in the process must be acting in the regular course of

business — otherwise, an essential link in the trustworthiness chain is missing.

*Williams v. Asplundh Tree Co.*, No. 3:05-CV-479-J-33MCR, 2006 WL 2868923, *9

(M.D. Fla. Oct. 6, 2006) (internal quotations and citations omitted) (alteration

supplied).  Accordingly, plaintiff must show that "[a]ll participants, including the

observer or participant furnishing the information to be recorded, were acting

routinely, under a duty of accuracy, with employer reliance on the result, or in short,

in the regular course of business."  Fed. R. Evid. 803(6), Advisory Committee Note

(alteration supplied).

        The first sentence of Aide Jones's e-mail states that Jones "hereby resign[s]

from [her] job at The Arc of Madison, for these reasons."[235]  Thus, it appears that the

purpose of the e-mail was to tender Jones's resignation and explain her reasons for

doing so, not to make a complaint in accordance with a business duty under a

complaint policy.  Indeed, plaintiff cites no evidence to show that defendant had such

a policy, that defendant investigated Jones's various claims, or that defendant kept her

---

[235] Doc. no. 25-1 (Affidavit of Constance Jones), exhibit A (Jones E-Mail), at 8 (alterations
supplied).

e-mail as part of the investigation.  Accordingly, there is no indication that the e-mail was sent or kept within the regular course of business.  Thus, it is not admissible as a business record.

Plaintiff then argues that Aide Jones's e-mail and affidavit contain present sense impressions in the form of "statement[s] by [Aide] Brand, [plaintiff], or others describing or explaining an event or condition, made while or immediately after the declarant perceived it,"[236] and that the evidence contains excited utterances because the statements "are all part of a startling event or condition experienced by [plaintiff] and Ms. Jones, being investigated by their employer for abuse . . . while the declarant was under the stress of excitement that it caused."[237]  As evident from the language of plaintiff's arguments, a present sense impression is a "statement describing or explaining an event or condition, made *while* or *immediately after* the declarant perceived it," Fed. R. Evid. 803(1), and an excited utterance is a "statement relating to a startling event or condition, made *while* the declarant was under the stress of excitement that it caused."  Fed. R. Evid. 803(2) (emphasis supplied).

The most significant practical difference between a present sense impression and an excited utterance lies "in the time lapse allowable between event and

---

[236] Doc. no. 24 (Response in Opposition to Motion to Strike Portions of the Affidavit of Constance Jones), at 3 (alterations supplied).

[237] *Id.* (alteration supplied).

statement." Fed. R. Evid. 803(1)-(2), Advisory Committee Note. The exception for present sense impressions requires "substantial contemporaneity of event and statement," but "recognizes that in many, if not most, instances precise contemporaneity is not possible, and hence a slight lapse is allowable." *Id.* (alteration supplied). Under the exception for excited utterances, "the standard of measurement is the duration of the state of excitement." *Id.*

> The Fifth Circuit, in a case involving Rule 803(1) [the present sense impression exception], agreed with the District of Columbia Circuit that a delay of *15 to 45 minutes* in reporting an incident does not qualify reporting the incident 'immediately' after it occurred. *See United States v. Cain*, 587 F.2d 678, 681 (5th Cir. 1979),[238] citing *Hilyer v. Howat Concrete Co.*, 578 F.2d 422, 426 n.7, 188 U.S. App. D.C. 180 (D.C. Cir. 1978) ("an out-of-court statement made at least fifteen minutes after the event it describes is not admissible unless the declarant was still in a state of excitement resulting from the event [which would render the statement admissible under the 'excited utterance' exception to the hearsay rule, Fed. R. Evid. 803(2)]").

*Versata Software, Inc. v. Internet Brands, Inc.*, No. 2:08-CV-313-WCB, 2012 WL 2595275, *31 (E.D. Tex. July 5, 2012) (first alteration supplied) (second alteration in original) (emphasis supplied) (footnote supplied).

Defendant moves to strike only the portion of Aide Constance Jones's affidavit which describes the events that allegedly motivated Program Coordinator Kertrina

---

[238] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

Sharperson and Qualified Mental Retardation Professional Ann Finley to coerce Aide

Gina Brand into making the complaint against plaintiff after Christina became violent

and struck another client.[239]   Those events allegedly occurred on or about August 5,

2010.[240]   Defendant also moves to strike Jones's e-mail.[241]   Plaintiff has presented no

evidence regarding the dates when the additional events described therein occurred.

In any case, many of those events are not relevant to this action.  *See* Section IV(A),

*supra*.   Jones's e-mail was sent on August 17, 2010, and her affidavit was notarized

on April 16, 2012.[242]   Because the e-mail is nearly *two weeks* removed, and the

affidavit is nearly *two years* removed, from any material events described in the

documents, the evidence is not admissible as a present sense impression or an excited

utterance.

Plaintiff then argues that Aide Jones's e-mail and affidavit contain evidence of

then-existing state of mind because they show "intent, motive or plan *by* [*Program

Coordinator*] *Kertrina Sharperson* to get [plaintiff]."[243]   A statement of then-existing

mental condition is a "statement of *the declarant's* then-existing state of mind (such

---

[239] Doc. no. 29 (Motion to Strike Portions of the Affidavit of Constance Jones), at 2-4; *see also* doc. no. 25-1 (Affidavit of Constance Jones) ¶ 7 (alterations supplied).

[240] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 47-48, 210.

[241] Doc. no. 29 (Motion to Strike Portions of the Affidavit of Constance Jones), at 4.

[242] Doc. no. 25-1 (Affidavit of Constance Jones) at 5, and exhibit A (Jones E-Mail), at 7.

[243] Doc. no. 24 (Response in Opposition to Motion to Strike Portions of the Affidavit of Constance Jones), at 5-6 (alterations and emphasis supplied).

as motive, intent, or plan)."  Fed. R. Evid. 803(3) (emphasis supplied).  As the declarant is Jones, not Sharperson, neither the e-mail nor the affidavit is admissible as evidence of Sharperson's then-existing mental condition.

Plaintiff further argues that Aide Jones's e-mail and affidavit are not hearsay because they "can be considered by the court not to establish the underlying truth of the matters discussed therein, but rather to show discrepancies in the version of factual events cited by the defendant's witnesses, establishing the existence of serious and significant material fact questions that preclude summary judgment."[244]  Yet, if Jones's allegations regarding Program Coordinator Sharperson's motivations for coercing Aide Brand into making a complaint against plaintiff were not offered for their truth, then it is not clear how the evidence *could* establish "the existence of serious and significant material fact questions that preclude summary judgment."[245] *See Williams*, 2006 WL 2868923, at *9 (rejecting the argument that a letter regarding the plaintiff's allegations of racial discrimination was not hearsay because it was not offered for its truth on the grounds that, "[i]n explaining the relevance of these statements, [the plaintiff] says only that they are 'clearly probative of central issues in the case.'  [The plaintiff] has not shown any relevance these statements would have

---

[244] *Id.* at 4.

[245] *See id.*

except as evidence of their truth.") Accordingly, neither the e-mail nor the affidavit is admissible as evidence not offered for its truth.

Finally, plaintiff's arguments utterly fail to address the fact that Aide Jones's e-mail and affidavit are replete with statements that contains multiple levels of hearsay:  *e.g.*, "[Aide Brand] told [plaintiff and Jones] that [Program Coordinator Sharperson] and [QMRP Finley] assured her that [plaintiff] nor [Jones] would be in [plaintiff's classroom] tomorrow"; and, "When [Jones] returned, [plaintiff] told [Jones] that [Brand] said that [Jones] had thrown Christina and [another client,] Jeff[,] down in a chair and Ann Finley was watching [Jones] through the window in [plaintiff's classroom]."[246]  Plaintiff has not addressed, let alone established, why *every* level of hearsay should be admitted.  Thus, the motion to strike paragraph 7 of Aide Jones's affidavit and the entire attached e-mail will be granted.

## V.  MOTION FOR SUMMARY JUDGMENT

Defendant moves for summary judgment on plaintiff's claim for wrongful termination in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA").[247]  Under the FMLA, an eligible employee[248] is entitled to up

---

[246] Doc. no. 25-1 (Affidavit of Constance Jones) ¶ 7 (alterations supplied), and exhibit A (Jones E-Mail), at 12-13 (alterations supplied).

[247] Doc. no. 21 (Brief in Support of Motion for Summary Judgment), at 36.

[248] An "eligible employee" is defined as "an employee who has been employed — (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this

to twelve weeks of leave each year to care for a serious health condition of the employee, or the employee's child, spouse, or parent.  *See* 29 U.S.C. § 2612(a)(1).[249]

The FMLA further provides that

> any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave —
>
> > (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
> >
> > (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1)(A)-(B).  Such entitlements are limited by a subsequent section, providing that an eligible employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would

---

title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."  29 U.S.C. § 2611(2)(A).

[249]29 U.S.C. § 1612(a)(1) establishes an eligible employee's entitlement to leave as follows:

> Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
>
> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
>
> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.
>
> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter  or parent has a serious health condition
>
> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B).

To secure the availability of the foregoing entitlements, Congress declared it "unlawful for any employer to interfere with, restrain, or deny the exercise of[,] or the attempt to exercise, any right provided under this subchapter [of the FMLA]."  29 U.S.C. § 2615(a)(1).  In addition, Congress declared it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]," 29 U.S.C. § 2615(a)(2), *or* because such individual

> (1) has filed any charge, or has instituted or caused to be instituted any proceedings, under or related to [the FMLA];
>
> (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under [the FMLA]; or
>
> (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under [the FMLA].

29 U.S.C. § 2615(b); *see also* 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees . . . who have used FMLA leave.").

Consistent with the foregoing statutory provisions, the case law interpreting the FMLA recognizes two types of claims for alleged violations of the Act:  "*interference claims*, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act . . . and *retaliation claims*, in which an

58

employee asserts that his employer discriminated against him because he engaged in activity protected by the Act . . . . " *Strickland v. Water Works and Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (emphasis added) (citations and footnote omitted). *Accord O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2000). FMLA interference and retaliation claims have different elements.

> To state *a claim of interference* with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied. *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000); *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). In contrast, to succeed on *a retaliation claim*, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right. *King*, 166 F.3d at 891. In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." *Id*.

*Strickland*, 239 F.3d at 1206-07 (emphasis supplied); *see also Earl v. Mervyns, Inc*., 207 F.3d 1361, 1367 (11th Cir. 2000); *Graham v. State Farm Mutual Insurance Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999); *Dollar v. Shoney's, Inc*., 981 F. Supp. 1417, 1419 (N.D. Ala. 1997); *Kaylor v. Fannin Regional Hospital, Inc*., 946 F. Supp. 988, 999 (N.D. Ga. 1996); *Peters v. Community Action Committee, Inc.*, 977 F. Supp. 1428, 1435 (M.D. Ala. 1997).

The first count of plaintiff's complaint is entitled "Wrongful Termination in Violation of FMLA," and alleges that "Defendant's termination of Plaintiff, Sheba Rhodes, for requesting time off to for her own serious health condition, violates the Family and Medical Leave Act of 1993, 29 U.S.C §2601 *et seq.*"[250]   Because plaintiff's complaint "simply assert[s] that she was terminated '*for requesting time off*' under the FMLA," defendant argues that plaintiff's claim is only for retaliation, and not for interference.[251]   Plaintiff's response disputes this contention.[252]

> [T]ermination while on FMLA leave can create *both* a cognizable 'interference' claim *and* a cognizable 'retaliation' claim. *Strickland v. Water Works and Sewer Bd.*, 239 F.3d 1199 (11th Cir. 2001) (recognizing both causes of action for a termination); *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349 (11th Cir. 2000) (finding both causes of actions when the plaintiff did not specify which FMLA provision the employee was proceeding under).

*Smith v. Boyd Brothers Transportation*, No. 2:04-CV-1063-MHT (WO), 2006 WL 208696, *5 (M.D. Ala. Jan. 25, 2006).   The *Smith* court rejected a defendant employer's argument that an employee "did not properly assert an interference claim," reasoning that:

> [the employee's] interference claim and his retaliation claim arise out of the same factual evidence and, indeed, . . . his interference claim is

---

[250] Doc. no. 1 (Complaint) ¶ 16.

[251] Doc. no. 21 (Brief in Support of Motion for Summary Judgment), at 34 (quoting Doc. no. 1 (Complaint) ¶ 16) (emphasis in original).

[252] Doc. no. 24 (Response in Opposition to Motion for Summary Judgment), at 34.

> essentially subsumed within his retaliation claim ([the employee's]
> retaliation claim differs from his interference claim in that he must prove
> not only that he was terminated while on FMLA leave (the interference
> claim) but also that he was terminated while on FMLA leave for the
> specific purpose of retaliating or discriminating against him (the
> retaliation claim)).

*Smith*, 2006 WL 208696, at *5-6 (alterations supplied).    In accordance with

*Strickland*, *O'Connor*, and *Smith*, this court will consider plaintiff's termination as a

basis for both claims.  Because the interference analysis "tracks closely the FMLA

retaliation analysis," *Franks v. Indian Rivers Mental Health Center*, No.

7:08-CV-1035-SLB, 2012 WL 4736444, *53-54 (N.D. Ala. Sept. 30, 2012), this

discussion will address both FMLA claims simultaneously.

    "As under Title VII, a claim of FMLA retaliation can be made out by direct

evidence." *Gross-Jones v. Mercy Medical*, 874 F. Supp. 2d 1319 (S.D. Ala. 2012)

(citing *Schaaf v. SmithKline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010)).

Additionally:

> When a plaintiff asserts a claim of retaliation under the FMLA, in
> the absence of direct evidence of the employer's intent, we apply the
> same burden-shifting framework established by the Supreme Court in
> *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.
> Ed. 2d 668 (1973), for evaluating Title VII discrimination claim.  *See*
> *Brungart v. BellSouth Telecomm. Inc*., 231 F.3d 791, 798 (11th Cir.
> 2000).  In order to state a claim of retaliation, an employee must allege
> that:  (1) he engaged in a statutorily protected activity; (2) he suffered an
> adverse employment decision; and (3) the decision was causally related
> to the protected activity.  *Parris v. Miami Herald Publ'g Co.*, 216 F.3d

1298, 1301 (11th Cir. 2000).

*Strickland*, 239 F.3d at 1206-07; *see also Earl*, 207 F.3d at 1367; *Graham*, 193 F.3d at 1283; *King*, 166 F.3d at 892; *Dollar*, 981 F. Supp. at 1419; *Kaylor*, 946 F. Supp. at 999; *Peters*, 977 F. Supp. at 1435.

Under the *McDonnell Douglas* burden-shifting framework referenced in *Strickland*, the plaintiff bears the initial burden of establishing a *prima facie* case of intent to discriminate. *McDonnell Douglas*, 411 U.S. at 802; *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). The establishment of a *prima facie* case "creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254.

The effect of the presumption of discrimination is to shift to the employer the burden of producing, but not proving, some legitimate, nondiscriminatory reason for the contested employment action. *See McDonnell Douglas*, 411 U.S. at 802. To satisfy the burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55 (citation and footnote omitted).

Once the defendant has borne its burden of production, "the plaintiff has the

opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 1045 (1998).

> [T]his circuit's post-*Hicks* decisions uniformly hold that once a plaintiff has established a *prima facie* case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude [summary judgment or] entry of judgment as a matter of law.

*Combs*, 106 F.3d at 1532 (alterations supplied).

## A.     Plaintiff's Deposition Testimony

Defendant urges this court to dismiss plaintiff's claims "without even progressing to application of the traditional burden-shifting analysis" based on the "admissions" in the deposition testimony quoted in section II(H), *supra*.[253] According to defendant, plaintiff testified "that her termination had nothing to do with her protected FMLA activity, and further conced[ed] that because of her actions in violation of The Arc's policies, she would have been terminated regardless of what

---

[253] Doc. no. 30 (Reply in Support of Motion for Summary Judgment), at 12.

her supervisor thought or desired."[254]   Plaintiff's testimony included the following:

> Q.    You thought [that Program Coordinator Kertrina Sharperson] did not like you, not that you were [terminated for] taking FMLA, right?
>
> A.    I know that she did not like me.
>
> Q.    Right. But that was the reason that you thought she wanted you terminated, not FMLA?
>
> A.    Right.
>
> Q.    Okay.
>
> A.    Any reason.  She wanted me terminated.
>
> Q.    She wanted you terminated because she had personal issues with you?
>
> A.    Right.[255]

Later, plaintiff testified as follows:

> Q.    So even if it were the case that [Program Coordinator] Kertrina [Sharperson] somehow pressured [Aide] Gina [Brand], at the end of the day, Gina [Brand]'s statements that she gave to the investigators were still true statements, right?
>
> A.    Yes, that I read, yes.
>
> Q.    And you have no evidence that Kertrina [Sharperson] tried to coerce [Aides] Freddie Dowdell, Victoria Evans, Connie Laster, Beth Meagher, Michelle Timmons, or Donna Davis, right?

---

[254] *Id.* (alteration supplied).

[255] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 40-41 (alterations supplied).

> A.    No.
>
> . . . .
>
> Q.    And all of those people that I just mentioned also came forward with statements indicating that you had acted in violation of the Behavior Support Plan, right?
>
> A.    Right.[256]

Plaintiff then testified:

> Q.    And with the documents that I have showed you today, in fact, it appears that the reason you were terminated is allegations and a finding that you violated the Behavior Support Plan, not anything about FMLA, right?
>
> A.    True.[257]

Later, plaintiff testified as follows:

> Q.    And you have now agreed with me that it was not Kertrina [Sharperson] that caused your termination, it was these other things that we've talked about, right?
>
> A.    The things on the paper, yes, but Kertrina [Sharperson] harassed me the whole time.
>
> Q.    But you are not bringing a claim about that harassment, right?
>
> A.    Right.
>
> Q.    So your claim for negligent training, hiring and supervision is not a valid claim, given the testimony you have given today, is it?

---

[256] *Id.* at 140 (alterations supplied).

[257] *Id.* at 166.

Mr. Auffenorde:    Object to the form.  That calls for a legal conclusion on the part of the witness.

Q.    You have agreed with me that Kertrina Sharperson is not the one responsible for your termination, right?

A.    She had everything to do with my termination.

Q.    No.  You have already testified repeatedly that the cause of your termination were the individuals who gave statements for the investigative report, right?

A.    Right.

Q.    So it was not Kertrina [Sharperson] who interfered with you taking FMLA leave, it was the fact that you did not follow the Behavior Support Plan and got reported for it that caused you not to get FMLA leave, right?

A.    Right.[258]

Plaintiff also testified:

Q.    Well, you've already testified that it was a violation of the Behavior Support Plan when you allowed her to leave her head on the desk, right?

A.    Yes. I testified to that.

Q.    And so it was, therefore, reasonable for the Arc to have determined that you violated the Behavior Support Plan, right?

Mr. Auffenorde:    Object to the form.

---

[258] *Id.* at 194-95.

A.   Right.[259]

Defendant acknowledges that plaintiff prefaced some answers with caveats limiting their applicability to the contents of documents presented by defendant's counsel: *e.g.*, by stating "According to the papers, yes"; and "that's what's on the paper."[260]   However, defendant argues that "plaintiff did not *consistently* attach caveats to her answers."[261]   Upon review, none of the cases defendant cites stand for the proposition that if the plaintiff's use of caveats is not consistent, the court must construe her testimony as meaning that the caveats do not apply.

Instead, defendant's authorities discuss plaintiffs' *unequivocal* testimony.   In *Lightner v. City of Wilmington*, 545 F.3d 260, 264 (4th Cir. 2008), and *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1337 (8th Cir. 1996),[262] the plaintiffs flatly stated that they were fired in retaliation for investigating their employers' unlawful practices, which refuted their claims that they were fired because of their age, race, or gender.   In *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005),[263] the plaintiff's testimony contradicted the testimony of several other witnesses, not portions of her

---

[259] *Id.* at 219-20.

[260] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 165-66.

[261] Doc. no. 30 (Reply in Support of Motion for Summary Judgment), at 5 (emphasis supplied).

[262] *See id.*

[263] *See id.*

own deposition.  *Id.* at 1278.  Finally, in *Ross v. Jefferson County Department of Health*, 701 F.3d 655 (11th Cir. 2012),[264] the Eleventh Circuit emphasized that the plaintiff made the "*unequivocal* concession" that she did not feel like her termination had anything to do with her race.  *Id.* at *5 (emphasis supplied).

Indeed, several courts from outside this Circuit have declined to hold the plaintiffs' deposition testimony to be dispositive and, instead, reviewed the entire record of the case to determine the viability of the plaintiffs' FMLA claims.  *See Moll v. Tyco Healthcare*, No. 1:06-CV-00046, 2008 WL 420037, * 14 (S.D. Ohio Feb. 14, 2008) (holding that, "inasmuch as Defendant argues Plaintiff's deposition testimony is proof that Plaintiff took no further FMLA leave after June, 2004, the Court will not construe Plaintiff's characterization of his leave as dispositive, but instead consider the record as a whole"); *Collins v. United States Playing Card Co.*, 466 F. Supp. 2d 954, 969 (S.D. Ohio 2006); *Downs v. AOL Time Warner, Inc.*, No. 2:03-CV-1117, 2006 WL 162563, *28 (S.D. Ohio Jan. 20, 2006).

In *Collins*, the defendant argued that the plaintiff's testimony at his deposition was conclusive proof of the absence of a causal connection between his FMLA leave and his termination.  The *Collins* plaintiff testified as follows:

> Q.     And it also would be accurate that after you took the time that you

---

[264] Doc. no. 36 (Notice of Supplemental Authority), at 3.

requested under the Family and Medical Leave Act, you were not penalized for taking that time, correct?

A.     That's true.

. . .

Q.     And you also claim that, in the alternative . . . the company retaliated against you for taking FMLA leave?

A.     No.

Q.     They never did that, did they?

A.     No, not as far as I know about.

*Collins*, 466 F. Supp. 2d at 969 (internal citations omitted).  The court, nevertheless,

concluded that:

> [The plaintiff's] testimony is not dispositive of whether there was a causal connection between the exercise of his FMLA rights and his termination. . . . [T]he evidence demonstrates a temporal proximity between the time [plaintiff] gave the Company his request for intermittent FMLA leave in November 2004, the onset of Corrective Actions that same month, and his termination in March 2005. . . . [The plaintiff] alleged in his Complaint and has not abandoned his claim that the Company retaliated against him for attempting to exercise his FMLA rights.  The Court will not construe his deposition testimony, particularly in the context in which it was given, as dispositive.

*Id.* (footnote omitted) (alterations supplied).  Similarly, in *Downs v. AOL Time*

*Warner*:

> Plaintiff was asked on deposition whether he has any "facts to dispute the reasons [Defendant] gave [Plaintiff] for the termination?" (Plaintiff's

> Depo. at 336).  Plaintiff said he did not.  (*Id.*).  Contrary to Defendant's
> assertion, the Court does not view Plaintiff's testimony as precluding a
> showing of pretext.  Whether Plaintiff can establish pretext must
> considered in view of the record as a whole, not simply from one
> response Plaintiff gave on deposition.

*Downs*, 2006 WL 162563, at *28 (alterations in original).  Because plaintiff attached

caveats to her deposition testimony inconsistently, this court will not hold her

testimony to be dispositive, but will consider the record as a whole.

## B.    Plaintiff's Direct Evidence

Direct evidence of discrimination "reflects a discriminatory or
retaliatory attitude correlating to the discrimination or retaliation
complained of by the employee."  *Wilson v. B/E Aerospace, Inc.*, 376
F.3d 1079, 1086 (11th Cir. 2004) (quoting *Damon v. Fleming
Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999)).  It
"proves the existence of a fact without inference or presumption."
*Wilson*, 376 F.3d at 1086 (quoting *Burrell v. Bd of Trs. Of Ga. Military
Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997).  "Only the most blatant
remarks, whose intent could mean nothing other than to discriminate on
the basis of some impermissible factor constitute direct evidence of
discrimination."  *Dixon*, 627 F.3d at 854 (quoting *Wilson*, 376 F.3d at
1086).  "If the alleged statement suggests, but does not prove, a
discriminatory motive, then it is considered circumstantial evidence."
*Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1347 (11th Cir. 2005)
(citing *Wilson*, 376 F.3d at 1086).

*Dockens v. Dekalb County School System*, 441 F. App'x 704, 708 (11th Cir. 2011);

*see also Stokes v. City of Montgomery*, No. 2:07-CV-686, 2008 WL 4369247, *23-24

(M.D. Ala. Sept. 25, 2008) (same).  "Statements made by a non-decision maker are

not probative of discriminatory intent as direct evidence."  *Hyde v. K. B. Home, Inc.*,

355 F. App'x 266, 272 (11th Cir. 2009) (citing *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Stokes*, 2008 WL 4369247, at *23-24 (same).

During her deposition, plaintiff testified that, around the time she was gathering her paperwork to request FMLA leave, Program Coordinator Kertrina Sharperson told plaintiff and plaintiff's supervisor, Qualified Mental Retardation Professional Ann Finley, that she did not want plaintiff to have the surgeries that necessitated the leave because "it was too many people trying to take FMLA [leave].  And [plaintiff had] already taken FMLA [leave] twice and [she] was taking it again. [Sharperson] was tired of folks asking for FMLA [leave]."[265]

In addition to denying that Program Coordinator Sharperson ever made those statements,[266] defendant argues that the statements are not relevant because Executive Director Susan Klingel is defendant's final decision-maker on hiring and firing, and she alone made the decision to terminate plaintiff's employment, without input from Sharperson.[267] Plaintiff alleges that Klingel's decision was "influenced" by

---

[265] *Id.* at 31, 164.

[266] Doc. no. 23-4 (Affidavit of Kertrina Sharperson) ¶¶ 3-4; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 85.

[267] Doc. no. 30 (Brief in Support of Motion for Summary Judgment), at 17; *see also* doc. no. 22-3 (Deposition of Susan Klingel), at 10, 16, 102, 104; doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 15.

71

Sharperson, and that Sharperson claimed to have terminated employees in the past.[268]

To rebut plaintiff's testimony, defendant claims that Executive Director Klingel based her decision on statements from nine employees who witnessed plaintiff's actions toward Christina, "all of whom plaintiff conceded were not coerced" by Sharperson.[269]   However, the independence of *the witnesses* is not relevant because plaintiff does not allege that *the witnesses* made or influenced the decision to terminate her employment.  Because "the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment," *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*), this court will credit plaintiff's testimony that Sharperson influenced the termination decision. Accordingly, Sharperson's alleged statements constitute direct evidence of interference and retaliation.

## C.    Plaintiff's *Prima Facie* Case

"To state a claim under the FMLA [without direct evidence], a plaintiff must prove three elements at trial:  (1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision."

---

[268] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 27-28, 30-32, 165, 194, 197, 199.

[269] Doc. no. 30 (Brief in Support of Motion for Summary Judgment), at 17 (citing doc. no. 22-1 (Deposition of Sheba Rhodes), at 40)).

*Parris v. Miami Herald Publishing Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000) (alteration supplied) (citing *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)).

Demonstrating a casual linkage at the summary judgment stage is far less onerous than proving causation by a preponderance of the evidence at trial.  At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not *completely unrelated*."  *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (emphasis supplied) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).

"At a minimum, a plaintiff must generally establish that the employer was *actually aware* of the protected expression at the time it took the adverse employment action."  *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993); *see also, e.g., Gupta v. Florida Board of Regents*, 212 F.3d 571, 590 (11th Cir. 2000); *Farley v. Nationwide Mutual Insurance*, 197 F.3d 1322, 1337 (11th Cir. 1999) (emphasis supplied).

Plaintiff has borne her burden of proving a *prima facie* case of interference and retaliation.  On July 12, 2010, plaintiff requested, and received, defendant's approval

to take FMLA leave starting August 16, 2010.[270]  On August 5, 2010, less than two weeks before her leave was scheduled to begin, plaintiff was suspended pending an investigation.[271]  A mere four days before her leave was scheduled to begin, defendant terminated plaintiff's employment.[272]

Further, plaintiff's request, and approval, to take FMLA leave were not "wholly unrelated" to her termination because several of defendant's alleged decision-makers were "actually aware" of her FMLA status.  *See Meeks*, 15 F.3d at 1021; *Hairston*, 9 F.3d at 919.  Executive Director Susan Klingel testified that she is defendant's final decision-maker on hiring and firing, and that she alone made the decision to terminate plaintiff's employment.[273]  Plaintiff alleged that Program Coordinator Kertrina Sharperson also influenced the decision.[274]

Klingel, Sharperson, and plaintiff's supervisor, Qualified Mental Retardation Professional Ann Finley, were each aware that plaintiff had been approved for FMLA leave prior to her termination.[275]  Although *Medicaid Program Coordinator Roslyn*

---

[270] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 4 (2010 Request for FMLA Leave).

[271] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 47-48, 210.

[272] *Id.*, exhibit 3 (Termination Notice).

[273] Doc. no. 22-3 (Deposition of Susan Klingel), at 10, 16, 102, 104; doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 15.

[274] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 27-28, 30-32, 165, 194, 197.

[275] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 34-36; doc. no. 22-3 (Deposition of Susan Klingel), at 87-88; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 80, 84.

*Bridges*, who conducted the investigation against plaintiff, allegedly was *not* aware of plaintiff's FMLA status,[276] *Bridges's* lack of awareness is not relevant because Klingel testified, without contradiction, that Bridges had no input on the ultimate termination decision.

### D.    Defendant's explanation

"Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to 'articulate a legitimate, non[retaliatory] reason for the challenged employment action.'" *Morgan v. Orange County*, 477 F. App'x 625, 628 (11th Cir. 2012) (alteration in original) (quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)).   As an explanation for terminating plaintiff's employment, defendant alleges that plaintiff violated the Behavior Support Plan for Christina by attempting to manage her behavior by instructing her to put her head on the desk and allowing her to fall asleep while class was in session, which constituted neglect under defendant's "Individual Abuse, Neglect, and Mistreatment Policy."[277]

### E.    Pretext

If the employer articulates a legitimate reason for the adverse decision:

the plaintiff must demonstrate that the employer's proffered reason is a

---

[276] Doc. no. 23-2 (Deposition of Roslyn Bridges), at 91.

[277] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 29, and exhibit 3 (Termination Notice); doc. no. 22-3 (Deposition of Susan Klingel), at 18 (alteration supplied).

> pretext for retaliation. [*Chapman v. AI Transort*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*).] "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.* at 1030.  In addition, if the employer acted on an honestly held belief that the employee engaged in misconduct, even if it was mistaken, no retaliation exists.  *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000).

*Morgan v. Orange County*, 477 F. App'x 625, 628 (11th Cir. 2012) (alteration supplied).

> At the summary judgment stage, an employer's assertion that an employee was fired for violating a "'work rule'. . . is arguably pretextual when [the employee] submits evidence (1) that [he or] she did not violate the cited work rule, or (2) that if [he or] she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated."

*Jordan v. Warehouse Services*, 81 F. Supp. 2d 1257, 1271 (M.D. Ala. 2000) (alterations in original) (quoting *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999)).

Under the *second* prong of the *Jordan* test, plaintiff offers evidence that she was one of several employees who followed the challenged practice of instructing Christina to put her head on the desk and allowing her to fall asleep while class was in session.[278]   Those other employees allegedly included plaintiff's supervisor,

---

[278] *See* doc. no. 22-1 (Deposition of Sheba Rhodes)*,* at 61-62; doc. no. 25-1 (Affidavit of Constance Jones) ¶ 8.

Qualified Mental Retardation Professional Ann Finley, and Finley's supervisor, Program Coordinator Kertrina Sharperson, who, in fact, introduced the practice.[279] Plaintiff also notes that defendant did not investigate the way in which Finley or Sharperson treated Christina.[280]   However, plaintiff offers no evidence that Executive Director Susan Klingel knew of Finley and Sharperson's alleged violations.   Indeed, plaintiff testified that she did not report Sharperson's behavior.[281]

Unless a supervisor "knew of the events, the events cannot be considered in determining whether [the plaintiff] and [another employee] are similarly situated." *Knight v. Baptist Hospital of Miami, Inc.*, 330 F.3d 1313, 1317 n.5 (11th Cir. 2003) (alterations supplied); *see also Dinkins v. Suffolk Transportation Service, Inc.*, No. 07-CV-3567, 2010 WL 2816624, *10 (E.D. N.Y. July 15, 2010) ("An employee who allegedly engaged in misconduct comparable to the plaintiff's is not similarly situated to the plaintiff when the employer is unaware of what the comparator employee supposedly did.").   Accordingly, plaintiff cannot establish that defendant's stated reason for her termination was pretextual on the grounds that similarly situated employees who did not request FMLA leave were treated more favorably.

---

[279] *Id.*

[280]   Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 6 (Investigation Report), at ARC000099.

[281] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 20; *see also* doc. no. 22-1 (Deposition of Sheba Rhodes), at 190, 193 (alteration supplied).

Under the first prong of the *Jordan* test, plaintiff fares better.  Plaintiff testified that she believed her strategy of managing Christina's behavior by instructing her to place her head on the desk to be consistent with that portion of Christina's Behavior Support Plan stating that, if she "needs a break from a task[,] then give her a break and try again after she has calmed down."[282]   In addition to alleging that *Program Coordinator Sharperson* introduced the challenged practice, and that Sharperson and plaintiff's supervisor, QMRP Finley, *themselves* followed the practice,[283] plaintiff asserted that Sharperson often visited her classroom, and frequently observed that Christina had fallen asleep with her head on the desk, but that Sharperson did not report these occurrences as a violation of defendant's policies.[284]   Plaintiff also claimed that she repeatedly told Sharperson and another supervisor, QMRP David Lane, that Christina's medication was causing her to fall asleep in class.[285]

To determine whether plaintiff has submitted evidence sufficient to show "that [he or] she did not violate the cited work rule," *Jordan*, 81 F. Supp. 2d at 1271 (alterations in original) (quoting *Damon*, 196 F.3d at 1363 (11th Cir. 1999)), the

---

[282] *Id.* at 205-206, and exhibit 5 (BSP), at ARC000092 (alteration supplied).

[283] *See* doc. no. 22-1 (Deposition of Sheba Rhodes)*,* at 61-62; doc. no. 25-1 (Affidavit of Constance Jones) ¶ 8.

[284] Doc. no. 22-1 (Deposition of Sheba Rhodes)*,* at 51-52, 62, 124-25, 202-03; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 66.

[285] Doc. no. 22-1 (Deposition of Sheba Rhodes)*,* at  51-52; doc. no. 23-1 (Deposition of Kertrina Sharperson), at 68.

inquiry is *not* whether plaintiff instructed Christina to place her head on the desk, or allowed her to fall asleep while class was in session, but rather whether plaintiff was aware that the practice constituted a violation of Christina's Behavior Support Plan and, thus, whether it was neglectful under defendant's "Individual Abuse, Neglect, and Mistreatment" policy.   Crediting plaintiff's contentions that her supervisors themselves introduced or followed the practice, that her supervisors frequently observed Christina sleeping in class, and that her supervisors were aware of plaintiff's belief that Christina's medication was making her drowsy, it was reasonable for plaintiff to conclude that her supervisors had ratified the challenged practice as consistent with Christina's BSP.

Plaintiff's allegations are likewise sufficient to create a triable issue of fact regarding whether defendant terminated her employment based on an "honestly held belief" that she violated Christina's BSP. *See Morgan*, 477 F. App'x at 628 (citing *Total System*, 221 F.3d at 1176-77).   As discussed, plaintiff alleges that Program Coordinator Sharperson introduced the practices of:  instructing Christina to place her head on the desk, and allowing her to fall asleep while class was in session; that Shaerperson personally followed the practice; and that Sharperson often saw Christina asleep in class, but that Sharperson did not influence the decision to terminate plaintiff's employment based on plaintiff's resort to the same practice until four days

before plaintiff was to begin her scheduled FMLA leave.  Further, plaintiff alleges that she told Sharperson and QMRP Lane that *Christina's medication* was causing her to fall asleep in class, which calls into question defendant's honestly held belief that *plaintiff* was responsible for Christina's sleeping habits.

In sum, upon a review of the record as a whole, plaintiff has also presented indirect evidence of interference and retaliation.

## F.   State-Law Claims for Negligent Hiring, Training, Supervision, and Retention

Defendant moves for summary judgment on plaintiff's claims for negligent hiring, training, supervision and retention on two separate grounds: first, that defendant conducted a background check on Program Coordinator Kertrina Sharperson before offering her a position at The Arc, and found no cause for concern regarding her criminal or employment history;[286] and second, that Sharperson did not commit a tort against plaintiff.[287]

Plaintiff's complaint alleges that defendant "caused [her] harassment and termination" by negligently hiring, training, retaining, and supervising Program Coordinator Sharperson and "other employees" in violation of state law.[288] (Despite

---

[286] Doc. no. 21 (Brief in Support of Motion for Summary Judgment), at 43.

[287] *Id.* at 41.

[288] Doc. no. 1 (Complaint) ¶¶ 18-23 (alteration supplied).

the complaint's reference to Sharperson *and* "other employees,"[289] plaintiff's responses to defendant's interrogatories only identified one employee with regard to whom defendant was allegedly negligent: *i.e.*, Sharperson.[290])

Specifically, plaintiff states that Program Coordinator Sharperson "harassed" her, and that, "[d]ue to Defendant's failure to check Sharperson's references, and its failure to properly train and supervise Sharperson, she failed to follow FMLA guidelines and interfered with [plaintiff] taking [her] approved FMLA leave."[291] Accordingly, plaintiff testified that "the sum and substance of [her] harassment claim is that [*Sharperson*] harassed [her] and tried to get [her] fired."[292]

Although plaintiff also states that *Yolanda Watkins*, a former supervisor who allegedly was intimate with both plaintiff and Program Coordinator Sharperson, was responsible for sexually harassing plaintiff, and "convinc[ing] [Sharperson] somehow that [plaintiff] was a bad employee, [and that she] wasn't doing what [she] was supposed to do,"[293] plaintiff testified that she had neither a harassment claim nor a negligence claim based on *Watkins's* actions.[294]

---

[289] *See id.* ¶¶ 18-23.

[290] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 2 (Interrogatory Responses) ¶¶ 4-8.

[291] *Id.,* exhibit 2 (Interrogatory Responses) ¶ 5 (alterations supplied).

[292] *Id.* at 183 (alterations supplied).

[293] *Id.* at 167 (alterations supplied).

[294] *Id.* at 163, 167, 186, 194.

81

Defendant first requests summary judgment on plaintiff's claims for negligent hiring, training, supervision, and retention because it conducted a background check on Program Coordinator Kertrina Sharperson before offering her a position at The Arc, and found no cause for concern regarding her criminal or employment history.[295] Discussing the elements of negligent supervision, the Supreme Court of Alabama noted that:

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence.

*Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 824 (Ala. Civ. App. 2000) (quoting *Collins v. Wilkerson*, 679 So. 2d 1100, 1103 (Ala. Civ. App. 1996); *Lane v. Central Bank of Alabama, N.A.*, 425 So. 2d 1098, 1100) (Ala. 1983)).

"[T]here is not an identifiable difference between [negligent training and supervision claims] in Alabama cases." *Zielke v. AmSouth Bank, N.A.*, 703 So. 2d 354, 358 n.1 (Ala. Civ. App. 1997) (alterations supplied). Thus, the requirement that a defendant have actual or constructive knowledge of an employee's unfitness applies

---

[295] Doc. no. 21 (Brief in Support of Motion for Summary Judgment), at 43.

to claims for negligent hiring, training, *and* supervision.  *See Portera v. Winn Dixie*,
996 F. Supp. 1418, 1438 (M.D. Ala. 1998).

In *Jackson v. Cintas Corp.*, 391 F. Supp. 2d 1075 (M.D. Ala. 2005), the court
granted the defendant's motion for summary judgment because the plaintiff did not
present

> any evidence that [the employee accused of sexual harassment]
> committed similar acts for a previous employer and that [the defendant]
> knew about these acts or should have discovered these acts in the
> exercise of due diligence.  As such, the court finds that [the plaintiff] has
> failed to establish the essential elements of her negligent hiring claim.

*Id.* at 1100 (alterations supplied) (internal quotations omitted).  As in *Jackson*, the
plaintiff in this case alleges that Program Coordinator Sharperson "harassed" her,[296]
but does not present any evidence that defendant either knew or should have known
that Sharperson harassed coworkers in the past, or that she harassed plaintiff during
the period at issue.

Plaintiff denies alleging that Program Coordinator Sharperson engaged in
harassment during her previous employment at Volunteers of America,[297] and argues
that, if defendant had checked Sharperson's references, it would have discovered that
she was forced to resign from Volunteers of America "for stealing and Social Security

---

[296] Doc. no. 1 (Complaint) ¶¶ 18-23; doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 2 (Interrogatory Responses) ¶ 5.

[297] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 180.

fraud."[298]   Plaintiff admits, however, that even if defendant had discovered that Sharperson had engaged in *stealing and fraud*, that fact would not have placed defendant on notice of Sharperson's propensity to engage in *FMLA retaliation*.[299]

Plaintiff also denies reporting the alleged harassment to Executive Director Susan Klingel or Medicaid Program Coordinator Roslyn Bridges.[300]  Thus, plaintiff has produced no evidence to dispute Klingel's statement that she was not aware of problems between plaintiff and Program Coordinator Sharperson.[301]  Accordingly, defendant is entitled to summary judgment on plaintiff's negligence claims because the record is devoid of evidence that defendant had actual or constructive knowledge of Sharperson's alleged unfitness.

Further, defendant argues that plaintiff's claim fails because Program Coordinator Sharperson did not commit a tort against her.[302]

> Under Alabama law, "[a] party alleging negligent or wanton hiring, supervision, training, and retention must prove the underlying wrongful conduct of employees." *Thornton v. Flavor House Prods., Inc.*, Case No. 1:07-cv-712-WKW, 2008 WL 5328492, at *19 (M.D. Ala. Dec. 19, 2008) (citing *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065 (Ala. 2003)).  Additionally, *the underlying wrongful conduct must be a*

---

[298] *Id.*, exhibit 2 (Interrogatory Responses) ¶ 4.

[299] *Id.* at 186, 189.

[300] *Id.* at 179.

[301] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 17.

[302] *Id.* at 41.

*"'common-law, Alabama tort'* committed by the employee, not [] a federal cause of action such as Title VII." *Ellis v. Advanced Tech. Servs.*, Case No. 3:10-cv-555-WHA, 2010 WL 3526169, at *2 (M.D. Ala. Sept. 3, 2010) (quoting *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002)).

. . .

Without an underlying tort claim, [an employee] cannot maintain his claims for negligent hiring, supervision, training, and negligent retention.

*Trainer v. Supreme Beverage Co.*, No. 2:11-cv-00057-WMA, 2013 WL 169288, *18-19 (N.D. Ala. Jan. 10, 2013) (Acker, J.) (first two alterations in original) (third alteration supplied) (emphasis supplied).

"Alabama does not recognize an independent cause of action for sexual harassment." *Ex parte Carlisle*, 26 So. 2d 1202, 1204 n.1 (Ala. 2009). This state also does not recognize a claim for the tort of outrage by an employee who allegedly was "harassed, investigated without cause, humiliated, accused of improper dealings, treated uncustomarily, and terminated without justification." *American Road Service Co. v. Inmon*, 394 So.2d 361, 367 (Ala. 1980). Accordingly, defendant is likewise entitled to summary judgment on plaintiff's negligence claims because Program Coordinator Sharperson is not accused of a tort.

## G.   Damages for Reinstatement, Front and Back Pay, and Injunctive and Equitable Relief

Defendant moves for summary judgment on plaintiff's requests for

85

reinstatement, front and back pay, and injunctive and equitable relief in light of after-

acquired evidence that plaintiff did not disclose her criminal conviction on her

employment application.[303]

> In *McKennon v. Nashville Banner Publishing Co.*, [513] U.S.
> [352], 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995), a case involving an
> alleged violation of the Age Discrimination in Employment Act of 1967
> ("ADEA"), the Supreme Court held that after-acquired evidence of
> wrongful conduct *during employment* that would have resulted in
> termination does not "operate[], in every instance, to bar all relief for an
> earlier violation of the Act." *Id.* at [358], 115 S. Ct. at 884. The Court
> held, however, that "the after-acquired evidence of the employee's
> wrongdoing bears on the specific remedy to be ordered." *Id.* at [360],
> 115 S. Ct. at 885. The Court determined that in cases in which an
> employee commits an act during employment that would lead to
> termination and the employer finds out about the act during the course
> of litigation, "neither reinstatement nor front pay is an appropriate
> remedy." *Id.* at [362], 115 S. Ct. at 886. The Court then discussed
> backpay, holding that it should be calculated "from the date of the
> unlawful discharge to the date the new information was discovered,"
> with the court "taking into further account extraordinary equitable
> circumstances that affect the legitimate interests of either party." *Id.*

*Wallace v. Dunn Construction Co.*, 62 F.3d 374, 378 (11th Cir. 1995) (alterations and

emphasis supplied). The Eleventh Circuit has explicitly concluded that the reasoning

underlying the holding in *McKennon* "applies with equal force when the

after-acquired evidence concerns an employee's fraud *in the application process*."

*Wallace*, 62 F.3d at 377 (emphasis supplied). Accordingly, the Eleventh Circuit

---

[303] Doc. no. 21 (Brief in Support of Motion for Summary Judgment), at 36.

reversed the denial of a employer's motion for summary judgment on an employee's claims for reinstatement, front pay, and injunctive relief because the employee failed to disclose her drug convictions on her employment application. *Id.* at 381.  This Circuit has continued to follow *McKennon* in subsequent cases.  *See, e.g., Crapp v. City of Miami Beach*, 242 F.3d 1017, 1021 (11th Cir. 2001) (quoting *McKennon*, 513 U.S. at 362).

Multiple courts have applied the same analysis to claims for damages pursuant to the FMLA.  *See, e.g., Throneberry v. McGehee Desha County Hospital*, 403 F.3d 972, 976-80 (8th Cir. 2005); *Miller v. AT&T Corp.*, 250 F.3d 820, 837 (4th Cir. 2001); *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 512-14 (6th Cir. 2006).  In *Calvert v. Smith's Food & Drug Centers, Inc.*, No. 2:06-CV-299-TS, 2007 WL 4207198 (D. Utah Nov. 26, 2007), the plaintiff sued his former employer for FMLA violations, and the employer moved for summary judgment on damages because the plaintiff did not disclose his criminal convictions on his employment application. *Id.* at *7.  In limiting the plaintiff's damages to the period between his termination and the date that the defendant discovered his criminal history, the *Calvert* court noted that

> Plaintiff does not contest his criminal history.  In fact, Plaintiff testified about his criminal history during his deposition.  Further, Plaintiff admitted that he answered his employment application incorrectly with regard to that criminal history.  Finally, Plaintiff has come forward with no evidence to dispute the Affidavit of Alan Brown

87

which states that "[h]ad [the defendant] known of Plaintiff's extensive
criminal history and his dishonesty, as exhibited in his employment
application, [the defendant] would have immediately terminated
Plaintiff's employment on October 2, 2006."

*Id.* (alterations supplied) (footnote omitted).

As in *Calvert*, the plaintiff in this case has admitted that she was convicted of
a misdemeanor, and that she did not disclose her conviction on her employment
application.   Specifically, plaintiff was convicted of a misdemeanor for "under-
ringing" items during her employment as a cashier at Wal-Mart.[304] As part of her
application, however, plaintiff answered "No" to the question:  "Have you ever been
convicted of a crime?"[305]  Plaintiff also signed a certification stating that "the facts
contained in [the] application are true and complete."[306]

Further, plaintiff has produced no evidence to dispute Executive Director
Klingel's testimony that "[defendant] considers false statements in applications very
serious, [that Klingel] will not hire or retain individuals who make false statements,"
and that, "[h]ad [Klingel] known about [plaintiff's] falsification of her application at
a time when she was applying for employment or employed by [defendant], [Klingel]

---

[304] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 8-9, 22.  For a definition of "under-
ringing," *see* http://www.termwiki.com/EN:under-ring.

[305] Doc. no. 22-1 (Deposition of Sheba Rhodes), exhibit 1(Employment Application), at 4.

[306] *Id.* (alteration supplied).

would have refused to hire [plaintiff] or terminated her employment."[307]  Indeed, plaintiff admitted that, in light of the certification of completeness, making a false statement on her employment application was grounds for her termination.[308]

Because plaintiff's damages are limited to the period between the date of her termination (August 12, 2010) and the date that the Executive Director Susan Klingel discovered her criminal history (*i.e.*, the date of plaintiff's deposition taken on February 3, 2012),[309] this court will grant the motion for summary judgment on plaintiff's requests for reinstatement, front pay, and injunctive and equitable relief. It will also limit plaintiff's back pay to the seventeen-month period between her termination on August 12, 2010 and her deposition on February 3, 2012.[310]

## VI.  CONCLUSION

This court will enter an appropriate order, consistent with this opinion, and granting: (1) the motion to hold admitted defendant's undisputed facts numbers 68 and 69, with the exception of the portion of defendant's undisputed fact number 68 which states that Aide Gina Brand "told [Program Coordinator Kertrina Sharperson that

---

[307] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶¶ 18-19 (alterations supplied).

[308] Doc. no. 22-1 (Deposition of Sheba Rhodes), at 22-23.

[309] Doc. no. 23-3 (Affidavit of Susan Klingel) ¶ 19.

[310] Thus, this discussion need not reach defendant's claim that this court should limit plaintiff's damages in light of after-acquired evidence that she failed to report Program Coordinator Kertrina Sharperson's alleged violations of Christina's Behavior Support Plan.  *See* doc. no. 21 (Brief in Support of Motion for Summary Judgment), at 37.

plaintiff] was engaging in a practice of instructing Christina to place her head down and encouraging aides to leave her alone,"[311] (2) the motion to strike portions of the affidavit of Constance Jones, (3) the motion for summary judgment on plaintiff's state-law claims for negligent hiring, training, supervision, and retention, and (4) the motion for summary judgment on plaintiff's damages requests for reinstatement, front pay, and injunctive and equitable relief.  Plaintiff's request for back pay will be limited to the period between her termination on August 12, 2010 and her deposition on February 3, 2012.  The remaining portions of defendant's motions will be denied.

DONE this 25th day of January, 2013.

United States District Judge

---

[311] *See* doc. no. 21 (Brief in Support of Motion for Summary Judgment), at 12 (alteration supplied).